# TEXAS v. JOHNSON

CERTIORARI TO THE COURT OF CRIMINAL APPEALS OF TEXAS

No. 88–155.   Argued March 21, 1989—Decided June 21, 1989

*Kathi Alyce Drew* argued the cause for petitioner. With her on the briefs were *John Vance* and *Dolena T. Westergard.*

*William M. Kunstler* argued the cause for respondent. With him on the brief was *David D. Cole.**

---

*Briefs of *amici curiae* urging reversal were filed for the Legal Affairs Council by *Wyatt B. Durrette, Jr.,* and *Bradley B. Cavedo;* and for the Washington Legal Foundation by *Daniel J. Popeo* and *Paul D. Kamenar.*

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *Peter Linzer, James C. Harrington,* and

JUSTICE BRENNAN delivered the opinion of the Court.

After publicly burning an American flag as a means of political protest, Gregory Lee Johnson was convicted of desecrating a flag in violation of Texas law. This case presents the question whether his conviction is consistent with the First Amendment. We hold that it is not.

I

While the Republican National Convention was taking place in Dallas in 1984, respondent Johnson participated in a political demonstration dubbed the "Republican War Chest Tour." As explained in literature distributed by the demonstrators and in speeches made by them, the purpose of this event was to protest the policies of the Reagan administration and of certain Dallas-based corporations. The demonstrators marched through the Dallas streets, chanting political slogans and stopping at several corporate locations to stage "die-ins" intended to dramatize the consequences of nuclear war. On several occasions they spray-painted the walls of buildings and overturned potted plants, but Johnson himself took no part in such activities. He did, however, accept an American flag handed to him by a fellow protestor who had taken it from a flagpole outside one of the targeted buildings.

The demonstration ended in front of Dallas City Hall, where Johnson unfurled the American flag, doused it with kerosene, and set it on fire. While the flag burned, the protestors chanted: "America, the red, white, and blue, we spit on you." After the demonstrators dispersed, a witness to the flag burning collected the flag's remains and buried them in his backyard. No one was physically injured or threatened with injury, though several witnesses testified that they had been seriously offended by the flag burning.

*Steven R. Shapiro;* for the Christic Institute et al. by *James C. Goodale;* and for Jasper Johns et al. by *Robert G. Sugarman* and *Gloria C. Phares.*

Of the approximately 100 demonstrators, Johnson alone was charged with a crime. The only criminal offense with which he was charged was the desecration of a venerated object in violation of Tex. Penal Code Ann. § 42.09(a)(3) (1989).[1] After a trial, he was convicted, sentenced to one year in prison, and fined $2,000. The Court of Appeals for the Fifth District of Texas at Dallas affirmed Johnson's conviction, 706 S. W. 2d 120 (1986), but the Texas Court of Criminal Appeals reversed, 755 S. W. 2d 92 (1988), holding that the State could not, consistent with the First Amendment, punish Johnson for burning the flag in these circumstances.

The Court of Criminal Appeals began by recognizing that Johnson's conduct was symbolic speech protected by the First Amendment: "Given the context of an organized demonstration, speeches, slogans, and the distribution of literature, anyone who observed appellant's act would have understood the message that appellant intended to convey. The act for which appellant was convicted was clearly 'speech' contemplated by the First Amendment." *Id.*, at 95. To justify Johnson's conviction for engaging in symbolic speech, the State asserted two interests: preserving the flag as a symbol of national unity and preventing breaches of the peace. The Court of Criminal Appeals held that neither interest supported his conviction.

---

[1] Texas Penal Code Ann. § 42.09 (1989) provides in full:

"§ 42.09. Desecration of Venerated Object

"(a) A person commits an offense if he intentionally or knowingly desecrates:

"(1) a public monument;

"(2) a place of worship or burial; or

"(3) a state or national flag.

"(b) For purposes of this section, 'desecrate' means deface, damage, or otherwise physically mistreat in a way that the actor knows will seriously offend one or more persons likely to observe or discover his action.

"(c) An offense under this section is a Class A misdemeanor."

Acknowledging that this Court had not yet decided whether the Government may criminally sanction flag desecration in order to preserve the flag's symbolic value, the Texas court nevertheless concluded that our decision in *West Virginia Board of Education* v. *Barnette*, 319 U. S. 624 (1943), suggested that furthering this interest by curtailing speech was impermissible. "Recognizing that the right to differ is the centerpiece of our First Amendment freedoms," the court explained, "a government cannot mandate by fiat a feeling of unity in its citizens. Therefore, that very same government cannot carve out a symbol of unity and prescribe a set of approved messages to be associated with that symbol when it cannot mandate the status or feeling the symbol purports to represent." 755 S. W. 2d, at 97. Noting that the State had not shown that the flag was in "grave and immediate danger," *Barnette, supra,* at 639, of being stripped of its symbolic value, the Texas court also decided that the flag's special status was not endangered by Johnson's conduct. 755 S. W. 2d, at 97.

As to the State's goal of preventing breaches of the peace, the court concluded that the flag-desecration statute was not drawn narrowly enough to encompass only those flag burnings that were likely to result in a serious disturbance of the peace. And in fact, the court emphasized, the flag burning in this particular case did not threaten such a reaction. "'Serious offense' occurred," the court admitted, "but there was no breach of peace nor does the record reflect that the situation was potentially explosive. One cannot equate 'serious offense' with incitement to breach the peace." *Id.,* at 96. The court also stressed that another Texas statute, Tex. Penal Code Ann. § 42.01 (1989), prohibited breaches of the peace. Citing *Boos* v. *Barry*, 485 U. S. 312 (1988), the court decided that § 42.01 demonstrated Texas' ability to prevent disturbances of the peace without punishing this flag desecration. 755 S. W. 2d, at 96.

Because it reversed Johnson's conviction on the ground that § 42.09 was unconstitutional as applied to him, the state court did not address Johnson's argument that the statute was, on its face, unconstitutionally vague and over-broad. We granted certiorari, 488 U. S. 907 (1988), and now affirm.

## II

Johnson was convicted of flag desecration for burning the flag rather than for uttering insulting words.[2]   This fact

---

[2] Because the prosecutor's closing argument observed that Johnson had led the protestors in chants denouncing the flag while it burned, Johnson suggests that he may have been convicted for uttering critical words rather than for burning the flag. Brief for Respondent 33–34. He relies on *Street* v. *New York*, 394 U. S. 576, 578 (1969), in which we reversed a conviction obtained under a New York statute that prohibited publicly defying or casting contempt on the flag "either by words or act" because we were persuaded that the defendant may have been convicted for his words alone. Unlike the law we faced in *Street*, however, the Texas flag-desecration statute does not on its face permit conviction for remarks critical of the flag, as Johnson himself admits. See Brief for Respondent 34. Nor was the jury in this case told that it could convict Johnson of flag desecration if it found only that he had uttered words critical of the flag and its referents.

Johnson emphasizes, though, that the jury was instructed—according to Texas' law of parties—that "'a person is criminally responsible for an offense committed by the conduct of another if acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.'" *Id.*, at 2, n. 2, quoting 1 Record 49. The State offered this instruction because Johnson's defense was that he was not the person who had burned the flag. Johnson did not object to this instruction at trial, and although he challenged it on direct appeal, he did so only on the ground that there was insufficient evidence to support it. 706 S. W. 2d 120, 124 (Tex. App. 1986). It is only in this Court that Johnson has argued that the law-of-parties instruction might have led the jury to convict him for his words alone. Even if we were to find that this argument is properly raised here, however, we would conclude that it has no merit in these circumstances. The instruction would not have permitted a conviction merely for the pejorative nature of Johnson's words, and those words themselves did not encourage the burning of the flag as the instruction seems to require. Given the additional fact that "the bulk of the State's

somewhat complicates our consideration of his conviction under the First Amendment. We must first determine whether Johnson's burning of the flag constituted expressive conduct, permitting him to invoke the First Amendment in challenging his conviction. See, e. g., Spence v. Washington, 418 U. S. 405, 409–411 (1974). If his conduct was expressive, we next decide whether the State's regulation is related to the suppression of free expression. See, e. g., United States v. O'Brien, 391 U. S. 367, 377 (1968); Spence, supra, at 414, n. 8. If the State's regulation is not related to expression, then the less stringent standard we announced in United States v. O'Brien for regulations of noncommunicative conduct controls. See O'Brien, supra, at 377. If it is, then we are outside of O'Brien's test, and we must ask whether this interest justifies Johnson's conviction under a more demanding standard.[3] See Spence, supra, at 411. A

---

argument was premised on Johnson's culpability as a sole actor," ibid., we find it too unlikely that the jury convicted Johnson on the basis of this alternative theory to consider reversing his conviction on this ground.

[3] Although Johnson has raised a facial challenge to Texas' flag-desecration statute, we choose to resolve this case on the basis of his claim that the statute as applied to him violates the First Amendment. Section 42.09 regulates only physical conduct with respect to the flag, not the written or spoken word, and although one violates the statute only if one "knows" that one's physical treatment of the flag "will seriously offend one or more persons likely to observe or discover his action," Tex. Penal Code Ann. § 42.09(b) (1989), this fact does not necessarily mean that the statute applies only to expressive conduct protected by the First Amendment. Cf. Smith v. Goguen, 415 U. S. 566, 588 (1974) (WHITE, J., concurring in judgment) (statute prohibiting "contemptuous" treatment of flag encompasses only expressive conduct). A tired person might, for example, drag a flag through the mud, knowing that this conduct is likely to offend others, and yet have no thought of expressing any idea; neither the language nor the Texas courts' interpretations of the statute precludes the possibility that such a person would be prosecuted for flag desecration. Because the prosecution of a person who had not engaged in expressive conduct would pose a different case, and because this case may be disposed of on narrower grounds, we address only Johnson's claim that § 42.09 as applied to political expression like his violates the First Amendment.

third possibility is that the State's asserted interest is simply not implicated on these facts, and in that event the interest drops out of the picture. See 418 U. S., at 414, n. 8.

The First Amendment literally forbids the abridgment only of "speech," but we have long recognized that its protection does not end at the spoken or written word. While we have rejected "the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea," *United States* v. *O'Brien, supra,* at 376, we have acknowledged that conduct may be "sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments," *Spence, supra,* at 409.

In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, we have asked whether "[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it." 418 U. S., at 410–411. Hence, we have recognized the expressive nature of students' wearing of black armbands to protest American military involvement in Vietnam, *Tinker* v. *Des Moines Independent Community School Dist.,* 393 U. S. 503, 505 (1969); of a sit-in by blacks in a "whites only" area to protest segregation, *Brown* v. *Louisiana,* 383 U. S. 131, 141–142 (1966); of the wearing of American military uniforms in a dramatic presentation criticizing American involvement in Vietnam, *Schacht* v. *United States,* 398 U. S. 58 (1970); and of picketing about a wide variety of causes, see, *e. g., Food Employees* v. *Logan Valley Plaza, Inc.,* 391 U. S. 308, 313–314 (1968); *United States* v. *Grace,* 461 U. S. 171, 176 (1983).

Especially pertinent to this case are our decisions recognizing the communicative nature of conduct relating to flags. Attaching a peace sign to the flag, *Spence, supra,* at 409–410; refusing to salute the flag, *Barnette,* 319 U. S., at 632; and displaying a red flag, *Stromberg* v. *California,* 283 U. S. 359,

368–369 (1931), we have held, all may find shelter under the First Amendment. See also *Smith* v. *Goguen*, 415 U. S. 566, 588 (1974) (WHITE, J., concurring in judgment) (treating flag "contemptuously" by wearing pants with small flag sewn into their seat is expressive conduct). That we have had little difficulty identifying an expressive element in conduct relating to flags should not be surprising. The very purpose of a national flag is to serve as a symbol of our country; it is, one might say, "the one visible manifestation of two hundred years of nationhood." *Id.*, at 603 (REHNQUIST, J., dissenting). Thus, we have observed:

> "[T]he flag salute is a form of utterance. Symbolism is a primitive but effective way of communicating ideas. The use of an emblem or flag to symbolize some system, idea, institution, or personality, is a short cut from mind to mind. Causes and nations, political parties, lodges and ecclesiastical groups seek to knit the loyalty of their followings to a flag or banner, a color or design." *Barnette, supra,* at 632.

Pregnant with expressive content, the flag as readily signifies this Nation as does the combination of letters found in "America."

We have not automatically concluded, however, that any action taken with respect to our flag is expressive. Instead, in characterizing such action for First Amendment purposes, we have considered the context in which it occurred. In *Spence*, for example, we emphasized that Spence's taping of a peace sign to his flag was "roughly simultaneous with and concededly triggered by the Cambodian incursion and the Kent State tragedy." 418 U. S., at 410. The State of Washington had conceded, in fact, that Spence's conduct was a form of communication, and we stated that "the State's concession is inevitable on this record." *Id.*, at 409.

The State of Texas conceded for purposes of its oral argument in this case that Johnson's conduct was expressive conduct, Tr. of Oral Arg. 4, and this concession seems to us as

prudent as was Washington's in *Spence*. Johnson burned an American flag as part—indeed, as the culmination—of a political demonstration that coincided with the convening of the Republican Party and its renomination of Ronald Reagan for President. The expressive, overtly political nature of this conduct was both intentional and overwhelmingly apparent. At his trial, Johnson explained his reasons for burning the flag as follows: "The American Flag was burned as Ronald Reagan was being renominated as President. And a more powerful statement of symbolic speech, whether you agree with it or not, couldn't have been made at that time. It's quite a just position [juxtaposition]. We had new patriotism and no patriotism." 5 Record 656. In these circumstances, Johnson's burning of the flag was conduct "sufficiently imbued with elements of communication," *Spence*, 418 U. S., at 409, to implicate the First Amendment.

## III

The government generally has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word. See *O'Brien*, 391 U. S. at 376–377; *Clark* v. *Community for Creative Non-Violence*, 468 U. S. 288, 293 (1984); *Dallas* v. *Stanglin*, 490 U. S. 19, 25 (1989). It may not, however, proscribe particular conduct *because* it has expressive elements. "[W]hat might be termed the more generalized guarantee of freedom of expression makes the communicative nature of conduct an inadequate *basis* for singling out that conduct for proscription. A law *directed at* the communicative nature of conduct must, like a law directed at speech itself, be justified by the substantial showing of need that the First Amendment requires." *Community for Creative Non-Violence* v. *Watt*, 227 U. S. App. D. C. 19, 55–56, 703 F. 2d 586, 622–623 (1983) (Scalia, J., dissenting) (emphasis in original), rev'd *sub nom. Clark* v. *Community for Creative Non-Violence, supra*. It is, in short, not simply the verbal or nonverbal nature of the expression, but the govern-

mental interest at stake, that helps to determine whether a restriction on that expression is valid.

Thus, although we have recognized that where "'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms," *O'Brien, supra,* at 376, we have limited the applicability of *O'Brien's* relatively lenient standard to those cases in which "the governmental interest is unrelated to the suppression of free expression." *Id.,* at 377; see also *Spence, supra,* at 414, n. 8. In stating, moreover, that *O'Brien's* test "in the last analysis is little, if any, different from the standard applied to time, place, or manner restrictions," *Clark, supra,* at 298, we have highlighted the requirement that the governmental interest in question be unconnected to expression in order to come under *O'Brien's* less demanding rule.

In order to decide whether *O'Brien's* test applies here, therefore, we must decide whether Texas has asserted an interest in support of Johnson's conviction that is unrelated to the suppression of expression. If we find that an interest asserted by the State is simply not implicated on the facts before us, we need not ask whether *O'Brien's* test applies. See *Spence, supra,* at 414, n. 8. The State offers two separate interests to justify this conviction: preventing breaches of the peace and preserving the flag as a symbol of nationhood and national unity. We hold that the first interest is not implicated on this record and that the second is related to the suppression of expression.

## A

Texas claims that its interest in preventing breaches of the peace justifies Johnson's conviction for flag desecration.[4]

---

[4] Relying on our decision in *Boos* v. *Barry,* 485 U. S. 312 (1988), Johnson argues that this state interest is related to the suppression of free expression within the meaning of *United States* v. *O'Brien,* 391 U. S. 367 (1968). He reasons that the violent reaction to flag burnings feared by

However, no disturbance of the peace actually occurred or threatened to occur because of Johnson's burning of the flag. Although the State stresses the disruptive behavior of the protestors during their march toward City Hall, Brief for Petitioner 34–36, it admits that "no actual breach of the peace occurred at the time of the flagburning or in response to the flagburning." *Id.*, at 34. The State's emphasis on the protestors' disorderly actions prior to arriving at City Hall is not only somewhat surprising given that no charges were brought on the basis of this conduct, but it also fails to show that a disturbance of the peace was a likely reaction to *Johnson's* conduct. The only evidence offered by the State at trial to show the reaction to Johnson's actions was the testimony of several persons who had been seriously offended by the flag burning. *Id.*, at 6–7.

The State's position, therefore, amounts to a claim that an audience that takes serious offense at particular expression is necessarily likely to disturb the peace and that the expression may be prohibited on this basis.[5] Our precedents do not countenance such a presumption. On the contrary, they recognize that a principal "function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or

---

Texas would be the result of the message conveyed by them, and that this fact connects the State's interest to the suppression of expression. Brief for Respondent 12, n. 11. This view has found some favor in the lower courts. See *Monroe* v. *State Court of Fulton County*, 739 F. 2d 568, 574–575 (CA11 1984). Johnson's theory may overread *Boos* insofar as it suggests that a desire to prevent a violent audience reaction is "related to expression" in the same way that a desire to prevent an audience from being offended is "related to expression." Because we find that the State's interest in preventing breaches of the peace is not implicated on these facts, however, we need not venture further into this area.

[5] There is, of course, a tension between this argument and the State's claim that one need not actually cause serious offense in order to violate § 42.09. See Brief for Petitioner 44.

even stirs people to anger." *Terminiello* v. *Chicago*, 337 U. S. 1, 4 (1949). See also *Cox* v. *Louisiana*, 379 U. S. 536, 551 (1965); *Tinker* v. *Des Moines Independent Community School Dist.* 393 U. S., at 508–509; *Coates* v. *Cincinnati*, 402 U. S. 611, 615 (1971); *Hustler Magazine, Inc.* v. *Falwell*, 485 U. S. 46, 55–56 (1988). It would be odd indeed to conclude *both* that "if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection," *FCC* v. *Pacifica Foundation*, 438 U. S. 726, 745 (1978) (opinion of STEVENS, J.), *and* that the government may ban the expression of certain disagreeable ideas on the unsupported presumption that their very disagreeableness will provoke violence.

Thus, we have not permitted the government to assume that every expression of a provocative idea will incite a riot, but have instead required careful consideration of the actual circumstances surrounding such expression, asking whether the expression "is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg* v. *Ohio*, 395 U. S. 444, 447 (1969) (reviewing circumstances surrounding rally and speeches by Ku Klux Klan). To accept Texas' arguments that it need only demonstrate "the potential for a breach of the peace," Brief for Petitioner 37, and that every flag burning necessarily possesses that potential, would be to eviscerate our holding in *Brandenburg*. This we decline to do.

Nor does Johnson's expressive conduct fall within that small class of "fighting words" that are "likely to provoke the average person to retaliation, and thereby cause a breach of the peace." *Chaplinsky* v. *New Hampshire*, 315 U. S. 568, 574 (1942). No reasonable onlooker would have regarded Johnson's generalized expression of dissatisfaction with the policies of the Federal Government as a direct personal insult or an invitation to exchange fisticuffs. See *id.*, at 572–573; *Cantwell* v. *Connecticut*, 310 U. S. 296, 309 (1940); *FCC* v. *Pacifica Foundation, supra,* at 745 (opinion of STEVENS, J.).

We thus conclude that the State's interest in maintaining order is not implicated on these facts. The State need not worry that our holding will disable it from preserving the peace. We do not suggest that the First Amendment forbids a State to prevent "imminent lawless action." *Brandenburg, supra,* at 447. And, in fact, Texas already has a statute specifically prohibiting breaches of the peace, Tex. Penal Code Ann. § 42.01 (1989), which tends to confirm that Texas need not punish this flag desecration in order to keep the peace. See *Boos* v. *Barry,* 485 U. S., at 327–329.

## B

The State also asserts an interest in preserving the flag as a symbol of nationhood and national unity. In *Spence,* we acknowledged that the government's interest in preserving the flag's special symbolic value "is directly related to expression in the context of activity" such as affixing a peace symbol to a flag. 418 U. S., at 414, n. 8. We are equally persuaded that this interest is related to expression in the case of Johnson's burning of the flag. The State, apparently, is concerned that such conduct will lead people to believe either that the flag does not stand for nationhood and national unity, but instead reflects other, less positive concepts, or that the concepts reflected in the flag do not in fact exist, that is, that we do not enjoy unity as a Nation. These concerns blossom only when a person's treatment of the flag communicates some message, and thus are related "to the suppression of free expression" within the meaning of *O'Brien.* We are thus outside of *O'Brien*'s test altogether.

## IV

It remains to consider whether the State's interest in preserving the flag as a symbol of nationhood and national unity justifies Johnson's conviction.

As in *Spence,* "[w]e are confronted with a case of prosecution for the expression of an idea through activity," and "[a]ccordingly, we must examine with particular care the inter-

ests advanced by [petitioner] to support its prosecution."
418 U. S., at 411. Johnson was not, we add, prosecuted for
the expression of just any idea; he was prosecuted for his ex-
pression of dissatisfaction with the policies of this country,
expression situated at the core of our First Amendment val-
ues. See, *e. g., Boos* v. *Barry, supra,* at 318; *Frisby* v.
*Schultz,* 487 U. S. 474, 479 (1988).

Moreover, Johnson was prosecuted because he knew that
his politically charged expression would cause "serious of-
fense." If he had burned the flag as a means of disposing of
it because it was dirty or torn, he would not have been con-
victed of flag desecration under this Texas law: federal law
designates burning as the preferred means of disposing of a
flag "when it is in such condition that it is no longer a fitting
emblem for display," 36 U. S. C. § 176(k), and Texas has no
quarrel with this means of disposal. Brief for Petitioner 45.
The Texas law is thus not aimed at protecting the physical
integrity of the flag in all circumstances, but is designed in-
stead to protect it only against impairments that would cause
serious offense to others.[6] Texas concedes as much: "Sec-
tion 42.09(b) reaches only those severe acts of physical abuse
of the flag carried out in a way likely to be offensive. The
statute mandates intentional or knowing abuse, that is, the
kind of mistreatment that is not innocent, but rather is inten-
tionally designed to seriously offend other individuals." *Id.,*
at 44.

Whether Johnson's treatment of the flag violated Texas
law thus depended on the likely communicative impact of his
expressive conduct.[7] Our decision in *Boos* v. *Barry, supra,*

---

[6] Cf. *Smith* v. *Goguen,* 415 U. S., at 590–591 (BLACKMUN, J., dissent-
ing) (emphasizing that lower court appeared to have construed state stat-
ute so as to protect physical integrity of the flag in all circumstances); *id.,*
at 597–598 (REHNQUIST, J., dissenting) (same).

[7] Texas suggests that Johnson's conviction did not depend on the onlook-
ers' reaction to the flag burning because § 42.09 is violated only when a per-
son physically mistreats the flag in a way that he *"knows* will seriously of-
fend one or more persons likely to observe or discover his action." Tex.

tells us that this restriction on Johnson's expression is content based. In *Boos*, we considered the constitutionality of a law prohibiting "the display of any sign within 500 feet of a foreign embassy if that sign tends to bring that foreign government into 'public odium' or 'public disrepute.'" *Id.*, at 315. Rejecting the argument that the law was content neutral because it was justified by "our international law obligation to shield diplomats from speech that offends their dignity," *id.*, at 320, we held that "[t]he emotive impact of speech on its audience is not a 'secondary effect'" unrelated to the content of the expression itself. *Id.*, at 321 (plurality opinion); see also *id.*, at 334 (BRENNAN, J., concurring in part and concurring in judgment).

According to the principles announced in *Boos*, Johnson's political expression was restricted because of the content of the message he conveyed. We must therefore subject the State's asserted interest in preserving the special symbolic character of the flag to "the most exacting scrutiny." *Boos* v. *Barry, supra*, at 321.[8]

---

Penal Code Ann. § 42.09(b) (1989) (emphasis added). "The 'serious offense' language of the statute," Texas argues, "refers to an individual's intent and to the manner in which the conduct is effectuated, not to the reaction of the crowd." Brief for Petitioner 44. If the statute were aimed only at the actor's intent and not at the communicative impact of his actions, however, there would be little reason for the law to be triggered only when an audience is "likely" to be present. At Johnson's trial, indeed, the State itself seems not to have seen the distinction between knowledge and actual communicative impact that it now stresses; it proved the element of knowledge by offering the testimony of persons who had in fact been seriously offended by Johnson's conduct. *Id.*, at 6–7. In any event, we find the distinction between Texas' statute and one dependent on actual audience reaction too precious to be of constitutional significance. Both kinds of statutes clearly are aimed at protecting onlookers from being offended by the ideas expressed by the prohibited activity.

<sup></sup>Our inquiry is, of course, bounded by the particular facts of this case and by the statute under which Johnson was convicted. There was no evidence that Johnson himself stole the flag he burned, Tr. of Oral Arg. 17, nor did the prosecution or the arguments urged in support of it depend on

Texas argues that its interest in preserving the flag as a symbol of nationhood and national unity survives this close analysis. Quoting extensively from the writings of this Court chronicling the flag's historic and symbolic role in our society, the State emphasizes the "'special place'" reserved for the flag in our Nation. Brief for Petitioner 22, quoting *Smith* v. *Goguen*, 415 U. S., at 601 (REHNQUIST, J., dissenting). The State's argument is not that it has an interest simply in maintaining the flag as a symbol of *something*, no matter what it symbolizes; indeed, if that were the State's position, it would be difficult to see how that interest is endangered by highly symbolic conduct such as Johnson's. Rather, the State's claim is that it has an interest in preserving the flag as a symbol of *nationhood* and *national unity*, a symbol with a determinate range of meanings. Brief for Petitioner 20–24. According to Texas, if one physically treats the flag in a way that would tend to cast doubt on either the idea that nationhood and national unity are the flag's referents or that national unity actually exists, the message conveyed thereby is a harmful one and therefore may be prohibited.[9]

---

the theory that the flag was stolen. *Ibid.* Thus, our analysis does not rely on the way in which the flag was acquired, and nothing in our opinion should be taken to suggest that one is free to steal a flag so long as one later uses it to communicate an idea. We also emphasize that Johnson was prosecuted *only* for flag desecration—not for trespass, disorderly conduct, or arson.

[9] Texas claims that "Texas is not endorsing, protecting, avowing or prohibiting any particular philosophy." Brief for Petitioner 29. If Texas means to suggest that its asserted interest does not prefer Democrats over Socialists, or Republicans over Democrats, for example, then it is beside the point, for Johnson does not rely on such an argument. He argues instead that the State's desire to maintain the flag as a symbol of nationhood and national unity assumes that there is only one proper view of the flag. Thus, if Texas means to argue that its interest does not prefer *any* viewpoint over another, it is mistaken; surely one's attitude toward the flag and its referents is a viewpoint.

If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.   See, *e. g.*, *Hustler Magazine, Inc.* v. *Falwell*, 485 U. S., at 55–56; *City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S. 789, 804 (1984); *Bolger* v. *Youngs Drug Products Corp.*, 463 U. S. 60, 65, 72 (1983); *Carey* v. *Brown*, 447 U. S. 455, 462–463 (1980); *FCC* v. *Pacifica Foundation*, 438 U. S., at 745–746; *Young* v. *American Mini Theatres, Inc.*, 427 U. S. 50, 63–65, 67–68 (1976) (plurality opinion); *Buckley* v. *Valeo*, 424 U. S. 1, 16–17 (1976); *Grayned* v. *Rockford*, 408 U. S. 104, 115 (1972); *Police Dept. of Chicago* v. *Mosley*, 408 U. S. 92, 95 (1972); *Bachellar* v. *Maryland*, 397 U. S. 564, 567 (1970); *O'Brien*, 391 U. S., at 382; *Brown* v. *Louisiana*, 383 U. S., at 142–143; *Stromberg* v. *California*, 283 U. S., at 368–369.

We have not recognized an exception to this principle even where our flag has been involved.   In *Street* v. *New York*, 394 U. S. 576 (1969), we held that a State may not criminally punish a person for uttering words critical of the flag.   Rejecting the argument that the conviction could be sustained on the ground that Street had "failed to show the respect for our national symbol which may properly be demanded of every citizen," we concluded that "the constitutionally guaranteed 'freedom to be intellectually . . . diverse or even contrary,' and the 'right to differ as to things that touch the heart of the existing order,' encompass the freedom to express publicly one's opinions about our flag, including those opinions which are defiant or contemptuous."   *Id.*, at 593, quoting *Barnette*, 319 U. S., at 642.   Nor may the government, we have held, compel conduct that would evince respect for the flag.   "To sustain the compulsory flag salute we are required to say that a Bill of Rights which guards the individual's right to speak his own mind, left it open to public authorities to compel him to utter what is not in his mind."   *Id.*, at 634.

In holding in *Barnette* that the Constitution did not leave this course open to the government, Justice Jackson described one of our society's defining principles in words deserving of their frequent repetition: "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Id.*, at 642. In *Spence*, we held that the same interest asserted by Texas here was insufficient to support a criminal conviction under a flag-misuse statute for the taping of a peace sign to an American flag. "Given the protected character of [Spence's] expression and in light of the fact that no interest the State may have in preserving the physical integrity of a privately owned flag was significantly impaired on these facts," we held, "the conviction must be invalidated." 418 U. S., at 415. See also *Goguen, supra,* at 588 (WHITE, J., concurring in judgment) (to convict person who had sewn a flag onto the seat of his pants for "contemptuous" treatment of the flag would be "[t]o convict not to protect the physical integrity or to protect against acts interfering with the proper use of the flag, but to punish for communicating ideas unacceptable to the controlling majority in the legislature").

In short, nothing in our precedents suggests that a State may foster its own view of the flag by prohibiting expressive conduct relating to it.[10] To bring its argument outside our

---

[10] Our decision in *Halter* v. *Nebraska*, 205 U. S. 34 (1907), addressing the validity of a state law prohibiting certain commercial uses of the flag, is not to the contrary. That case was decided "nearly 20 years before the Court concluded that the First Amendment applies to the States by virtue of the Fourteenth Amendment." *Spence* v. *Washington*, 418 U. S. 405, 413, n. 7 (1974). More important, as we continually emphasized in *Halter* itself, that case involved purely commercial rather than political speech. 205 U. S., at 38, 41, 42, 45.

Nor does *San Francisco Arts & Athletics, Inc.* v. *United States Olympic Committee*, 483 U. S. 522, 524 (1987), addressing the validity of Congress' decision to "authoriz[e] the United States Olympic Committee to prohibit

precedents, Texas attempts to convince us that even if its interest in preserving the flag's symbolic role does not allow it to prohibit words or some expressive conduct critical of the flag, it does permit it to forbid the outright destruction of the flag. The State's argument cannot depend here on the distinction between written or spoken words and nonverbal conduct. That distinction, we have shown, is of no moment where the nonverbal conduct is expressive, as it is here, and where the regulation of that conduct is related to expression, as it is here. See *supra*, at 402–403. In addition, both *Barnette* and *Spence* involved expressive conduct, not only verbal communication, and both found that conduct protected.

Texas' focus on the precise nature of Johnson's expression, moreover, misses the point of our prior decisions: their enduring lesson, that the government may not prohibit expression simply because it disagrees with its message, is not dependent on the particular mode in which one chooses to express an idea.[11] If we were to hold that a State may forbid flag burning wherever it is likely to endanger the flag's symbolic role, but allow it wherever burning a flag promotes that role—as where, for example, a person ceremoniously burns a dirty flag—we would be saying that when it comes to impairing the flag's physical integrity, the flag itself may be used as

---

certain commercial and promotional uses of the word 'Olympic,'" relied upon by THE CHIEF JUSTICE's dissent, *post*, at 429, even begin to tell us whether the government may criminally punish physical conduct towards the flag engaged in as a means of political protest.

[11] THE CHIEF JUSTICE's dissent appears to believe that Johnson's conduct may be prohibited and, indeed, criminally sanctioned, because "his act . . . conveyed nothing that could not have been conveyed and was not conveyed just as forcefully in a dozen different ways." *Post*, at 431. Not only does this assertion sit uneasily next to the dissent's quite correct reminder that the flag occupies a unique position in our society—which demonstrates that messages conveyed without use of the flag are not "just as forcefu[l]" as those conveyed with it—but it also ignores the fact that, in *Spence, supra*, we "rejected summarily" this very claim. See 418 U. S., at 411, n. 4.

a symbol—as a substitute for the written or spoken word or a "short cut from mind to mind"—only in one direction.   We would be permitting a State to "prescribe what shall be orthodox" by saying that one may burn the flag to convey one's attitude toward it and its referents only if one does not endanger the flag's representation of nationhood and national unity.

We never before have held that the Government may ensure that a symbol be used to express only one view of that symbol or its referents.   Indeed, in *Schacht* v. *United States*, we invalidated a federal statute permitting an actor portraying a member of one of our Armed Forces to "'wear the uniform of that armed force if the portrayal does not tend to discredit that armed force.'"   398 U. S., at 60, quoting 10 U. S. C. § 772(f).   This proviso, we held, "which leaves Americans free to praise the war in Vietnam but can send persons like Schacht to prison for opposing it, cannot survive in a country which has the First Amendment."   *Id.*, at 63.

We perceive no basis on which to hold that the principle underlying our decision in *Schacht* does not apply to this case. To conclude that the government may permit designated symbols to be used to communicate only a limited set of messages would be to enter territory having no discernible or defensible boundaries.   Could the government, on this theory, prohibit the burning of state flags?   Of copies of the Presidential seal? Of the Constitution?   In evaluating these choices under the First Amendment, how would we decide which symbols were sufficiently special to warrant this unique status?   To do so, we would be forced to consult our own political preferences, and impose them on the citizenry, in the very way that the First Amendment forbids us to do.   See *Carey* v. *Brown*, 447 U. S., at 466–467.

There is, moreover, no indication—either in the text of the Constitution or in our cases interpreting it—that a separate juridical category exists for the American flag alone.   Indeed, we would not be surprised to learn that the persons

who framed our Constitution and wrote the Amendment that we now construe were not known for their reverence for the Union Jack. The First Amendment does not guarantee that other concepts virtually sacred to our Nation as a whole—such as the principle that discrimination on the basis of race is odious and destructive—will go unquestioned in the marketplace of ideas. See *Brandenburg* v. *Ohio*, 395 U. S. 444 (1969). We decline, therefore, to create for the flag an exception to the joust of principles protected by the First Amendment.

It is not the State's ends, but its means, to which we object. It cannot be gainsaid that there is a special place reserved for the flag in this Nation, and thus we do not doubt that the government has a legitimate interest in making efforts to "preserv[e] the national flag as an unalloyed symbol of our country." *Spence*, 418 U. S., at 412. We reject the suggestion, urged at oral argument by counsel for Johnson, that the government lacks "any state interest whatsoever" in regulating the manner in which the flag may be displayed. Tr. of Oral Arg. 38. Congress has, for example, enacted precatory regulations describing the proper treatment of the flag, see 36 U. S. C. §§ 173–177, and we cast no doubt on the legitimacy of its interest in making such recommendations. To say that the government has an interest in encouraging proper treatment of the flag, however, is not to say that it may criminally punish a person for burning a flag as a means of political protest. "National unity as an end which officials may foster by persuasion and example is not in question. The problem is whether under our Constitution compulsion as here employed is a permissible means for its achievement." *Barnette*, 319 U. S., at 640.

We are fortified in today's conclusion by our conviction that forbidding criminal punishment for conduct such as Johnson's will not endanger the special role played by our flag or the feelings it inspires. To paraphrase Justice Holmes, we submit that nobody can suppose that this one gesture of an un-

known man will change our Nation's attitude towards its flag. See *Abrams* v. *United States*, 250 U. S. 616, 628 (1919) (Holmes, J., dissenting). Indeed, Texas' argument that the burning of an American flag " 'is an act having a high likelihood to cause a breach of the peace,' " Brief for Petitioner 31, quoting *Sutherland* v. *DeWulf*, 323 F. Supp. 740, 745 (SD Ill. 1971) (citation omitted), and its statute's implicit assumption that physical mistreatment of the flag will lead to "serious offense," tend to confirm that the flag's special role is not in danger; if it were, no one would riot or take offense because a flag had been burned.

We are tempted to say, in fact, that the flag's deservedly cherished place in our community will be strengthened, not weakened, by our holding today. Our decision is a reaffirmation of the principles of freedom and inclusiveness that the flag best reflects, and of the conviction that our toleration of criticism such as Johnson's is a sign and source of our strength. Indeed, one of the proudest images of our flag, the one immortalized in our own national anthem, is of the bombardment it survived at Fort McHenry. It is the Nation's resilience, not its rigidity, that Texas sees reflected in the flag—and it is that resilience that we reassert today.

The way to preserve the flag's special role is not to punish those who feel differently about these matters. It is to persuade them that they are wrong. "To courageous, self-reliant men, with confidence in the power of free and fearless reasoning applied through the processes of popular government, no danger flowing from speech can be deemed clear and present, unless the incidence of the evil apprehended is so imminent that it may befall before there is opportunity for full discussion. If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence." *Whitney* v. *California*, 274 U. S. 357, 377 (1927) (Brandeis, J., concurring). And, precisely because it is our flag that is involved, one's response to the flag

burner may exploit the uniquely persuasive power of the flag itself. We can imagine no more appropriate response to burning a flag than waving one's own, no better way to counter a flag burner's message than by saluting the flag that burns, no surer means of preserving the dignity even of the flag that burned than by—as one witness here did—according its remains a respectful burial. We do not consecrate the flag by punishing its desecration, for in doing so we dilute the freedom that this cherished emblem represents.

## V

Johnson was convicted for engaging in expressive conduct. The State's interest in preventing breaches of the peace does not support his conviction because Johnson's conduct did not threaten to disturb the peace. Nor does the State's interest in preserving the flag as a symbol of nationhood and national unity justify his criminal conviction for engaging in political expression. The judgment of the Texas Court of Criminal Appeals is therefore

*Affirmed.*

JUSTICE KENNEDY, concurring.

I write not to qualify the words JUSTICE BRENNAN chooses so well, for he says with power all that is necessary to explain our ruling. I join his opinion without reservation, but with a keen sense that this case, like others before us from time to time, exacts its personal toll. This prompts me to add to our pages these few remarks.

The case before us illustrates better than most that the judicial power is often difficult in its exercise. We cannot here ask another Branch to share responsibility, as when the argument is made that a statute is flawed or incomplete. For we are presented with a clear and simple statute to be judged against a pure command of the Constitution. The outcome can be laid at no door but ours.

The hard fact is that sometimes we must make decisions we do not like. We make them because they are right, right

in the sense that the law and the Constitution, as we see them, compel the result. And so great is our commitment to the process that, except in the rare case, we do not pause to express distaste for the result, perhaps for fear of undermining a valued principle that dictates the decision. This is one of those rare cases.

Our colleagues in dissent advance powerful arguments why respondent may be convicted for his expression, reminding us that among those who will be dismayed by our holding will be some who have had the singular honor of carrying the flag in battle. And I agree that the flag holds a lonely place of honor in an age when absolutes are distrusted and simple truths are burdened by unneeded apologetics.

With all respect to those views, I do not believe the Constitution gives us the right to rule as the dissenting Members of the Court urge, however painful this judgment is to announce. Though symbols often are what we ourselves make of them, the flag is constant in expressing beliefs Americans share, beliefs in law and peace and that freedom which sustains the human spirit. The case here today forces recognition of the costs to which those beliefs commit us. It is poignant but fundamental that the flag protects those who hold it in contempt.

For all the record shows, this respondent was not a philosopher and perhaps did not even possess the ability to comprehend how repellent his statements must be to the Republic itself. But whether or not he could appreciate the enormity of the offense he gave, the fact remains that his acts were speech, in both the technical and the fundamental meaning of the Constitution. So I agree with the Court that he must go free.

CHIEF JUSTICE REHNQUIST, with whom JUSTICE WHITE and JUSTICE O'CONNOR join, dissenting.

In holding this Texas statute unconstitutional, the Court ignores Justice Holmes' familiar aphorism that "a page of history is worth a volume of logic." *New York Trust Co.* v.

*Eisner,* 256 U. S. 345, 349 (1921). For more than 200 years, the American flag has occupied a unique position as the symbol of our Nation, a uniqueness that justifies a governmental prohibition against flag burning in the way respondent Johnson did here.

At the time of the American Revolution, the flag served to unify the Thirteen Colonies at home, while obtaining recognition of national sovereignty abroad. Ralph Waldo Emerson's "Concord Hymn" describes the first skirmishes of the Revolutionary War in these lines:

> "By the rude bridge that arched the flood
>   Their flag to April's breeze unfurled,
> Here once the embattled farmers stood
>   And fired the shot heard round the world."

During that time, there were many colonial and regimental flags, adorned with such symbols as pine trees, beavers, anchors, and rattlesnakes, bearing slogans such as "Liberty or Death," "Hope," "An Appeal to Heaven," and "Don't Tread on Me." The first distinctive flag of the Colonies was the "Grand Union Flag"—with 13 stripes and a British flag in the left corner—which was flown for the first time on January 2, 1776, by troops of the Continental Army around Boston. By June 14, 1777, after we declared our independence from England, the Continental Congress resolved:

> "That the flag of the thirteen United States be thirteen stripes, alternate red and white: that the union be thirteen stars, white in a blue field, representing a new constellation." 8 Journal of the Continental Congress 1774–1789, p. 464 (W. Ford ed. 1907).

One immediate result of the flag's adoption was that American vessels harassing British shipping sailed under an authorized national flag. Without such a flag, the British could treat captured seamen as pirates and hang them summarily; with a national flag, such seamen were treated as prisoners of war.

During the War of 1812, British naval forces sailed up Chesapeake Bay and marched overland to sack and burn the city of Washington. They then sailed up the Patapsco River to invest the city of Baltimore, but to do so it was first necessary to reduce Fort McHenry in Baltimore Harbor. Francis Scott Key, a Washington lawyer, had been granted permission by the British to board one of their warships to negotiate the release of an American who had been taken prisoner. That night, waiting anxiously on the British ship, Key watched the British fleet firing on Fort McHenry. Finally, at daybreak, he saw the fort's American flag still flying; the British attack had failed. Intensely moved, he began to scribble on the back of an envelope the poem that became our national anthem:

"O say can you see by the dawn's early light
What so proudly we hail'd at the twilight's last
  gleaming,
Whose broad stripes & bright stars through the
  perilous fight
O'er the ramparts we watch'd, were so gallantly
  streaming?
And the rocket's red glare, the bomb bursting in air,
Gave proof through the night that our flag was
  still there,
O say does that star-spangled banner yet wave
O'er the land of the free & the home of the brave?"

The American flag played a central role in our Nation's most tragic conflict, when the North fought against the South. The lowering of the American flag at Fort Sumter was viewed as the start of the war. G. Preble, History of the Flag of the United States of America 453 (1880). The Southern States, to formalize their separation from the Union, adopted the "Stars and Bars" of the Confederacy. The Union troops marched to the sound of "Yes We'll Rally Round The Flag Boys, We'll Rally Once Again." President Abraham Lincoln refused proposals to remove from the

American flag the stars representing the rebel States, because he considered the conflict not a war between two nations but an attack by 11 States against the National Government. *Id.*, at 411. By war's end, the American flag again flew over "an indestructible union, composed of indestructible states." *Texas* v. *White*, 7 Wall. 700, 725 (1869).

One of the great stories of the Civil War is told in John Greenleaf Whittier's poem, "Barbara Frietchie":

> "Up from the meadows rich with corn,
> Clear in the cool September morn,
> The clustered spires of Frederick stand
> Green-walled by the hills of Maryland.
> Round about them orchards sweep,
> Apple- and peach-tree fruited deep,
> Fair as a garden of the Lord
> To the eyes of the famished rebel horde,
> On that pleasant morn of the early fall
> When Lee marched over the mountain wall,—
> Over the mountains winding down,
> Horse and foot, into Frederick town.
> Forty flags with their silver stars,
> Forty flags with their crimson bars,
> Flapped in the morning wind: the sun
> Of noon looked down, and saw not one.
> Up rose old Barbara Frietchie then,
> Bowed with her fourscore years and ten;
> Bravest of all in Frederick town,
> She took up the flag the men hauled down;
> In her attic-window the staff she set,
> To show that one heart was loyal yet.
> Up the street came the rebel tread,
> Stonewall Jackson riding ahead.
> Under his slouched hat left and right
> He glanced: the old flag met his sight.
> 'Halt!'—the dust-brown ranks stood fast.
> 'Fire!'—out blazed the rifle-blast.

It shivered the window, pane and sash;
It rent the banner with seam and gash.
Quick, as it fell, from the broken staff
Dame Barbara snatched the silken scarf;
She leaned far out on the window-sill,
And shook it forth with a royal will.
'Shoot, if you must, this old gray head,
But spare your country's flag,' she said.
A shade of sadness, a blush of shame,
Over the face of the leader came;
The nobler nature within him stirred
To life at that woman's deed and word:
'Who touches a hair of yon gray head
Dies like a dog!  March on!' he said.
All day long through Frederick street
Sounded the tread of marching feet:
All day long that free flag tost
Over the heads of the rebel host.
Ever its torn folds rose and fell
On the loyal winds that loved it well;
And through the hill-gaps sunset light
Shone over it with a warm good-night.
Barbara Frietchie's work is o'er,
And the Rebel rides on his raids no more.
Honor to her! and let a tear
Fall, for her sake, on Stonewall's bier.
Over Barbara Frietchie's grave,
Flag of Freedom and Union, wave!
Peace and order and beauty draw
Round thy symbol of light and law;
And ever the stars above look down
On thy stars below in Frederick town!"

In the First and Second World Wars, thousands of our countrymen died on foreign soil fighting for the American cause.  At Iwo Jima in the Second World War, United States Marines fought hand to hand against thousands of

Japanese. By the time the Marines reached the top of Mount Suribachi, they raised a piece of pipe upright and from one end fluttered a flag. That ascent had cost nearly 6,000 American lives. The Iwo Jima Memorial in Arlington National Cemetery memorializes that event. President Franklin Roosevelt authorized the use of the flag on labels, packages, cartons, and containers intended for export as lend-lease aid, in order to inform people in other countries of the United States' assistance. Presidential Proclamation No. 2605, 58 Stat. 1126.

During the Korean war, the successful amphibious landing of American troops at Inchon was marked by the raising of an American flag within an hour of the event. Impetus for the enactment of the Federal Flag Desecration Statute in 1967 came from the impact of flag burnings in the United States on troop morale in Vietnam. Representative L. Mendel Rivers, then Chairman of the House Armed Services Committee, testified that "[t]he burning of the flag . . . has caused my mail to increase 100 percent from the boys in Vietnam, writing me and asking me what is going on in America." Desecration of the Flag, Hearings on H. R. 271 before Subcommittee No. 4 of the House Committee on the Judiciary, 90th Cong., 1st Sess., 189 (1967). Representative Charles Wiggins stated: "The public act of desecration of our flag tends to undermine the morale of American troops. That this finding is true can be attested by many Members who have received correspondence from servicemen expressing their shock and disgust of such conduct." 113 Cong. Rec. 16459 (1967).

The flag symbolizes the Nation in peace as well as in war. It signifies our national presence on battleships, airplanes, military installations, and public buildings from the United States Capitol to the thousands of county courthouses and city halls throughout the country. Two flags are prominently placed in our courtroom. Countless flags are placed by the graves of loved ones each year on what was first called

Decoration Day, and is now called Memorial Day. The flag is traditionally placed on the casket of deceased members of the Armed Forces, and it is later given to the deceased's family. 10 U. S. C. §§ 1481, 1482. Congress has provided that the flag be flown at half-staff upon the death of the President, Vice President, and other government officials "as a mark of respect to their memory." 36 U. S. C. § 175(m). The flag identifies United States merchant ships, 22 U. S. C. § 454, and "[t]he laws of the Union protect our commerce wherever the flag of the country may float." *United States* v. *Guthrie,* 17 How. 284, 309 (1855).

No other American symbol has been as universally honored as the flag. In 1931, Congress declared "The Star-Spangled Banner" to be our national anthem. 36 U. S. C. § 170. In 1949, Congress declared June 14th to be Flag Day. § 157. In 1987, John Philip Sousa's "The Stars and Stripes Forever" was designated as the national march. Pub. L. 101–186, 101 Stat. 1286. Congress has also established "The Pledge of Allegiance to the Flag" and the manner of its deliverance. 36 U. S. C. § 172. The flag has appeared as the principal symbol on approximately 33 United States postal stamps and in the design of at least 43 more, more times than any other symbol. United States Postal Service, Definitive Mint Set 15 (1988).

Both Congress and the States have enacted numerous laws regulating misuse of the American flag. Until 1967, Congress left the regulation of misuse of the flag up to the States. Now, however, 18 U. S. C. § 700(a) provides that:

> "Whoever knowingly casts contempt upon any flag of the United States by publicly mutilating, defacing, defiling, burning, or trampling upon it shall be fined not more than $1,000 or imprisoned for not more than one year, or both."

Congress has also prescribed, *inter alia,* detailed rules for the design of the flag, 4 U. S. C. § 1, the time and occasion of flag's display, 36 U. S. C. § 174, the position and manner of

its display, § 175, respect for the flag, § 176, and conduct during hoisting, lowering, and passing of the flag, § 177. With the exception of Alaska and Wyoming, all of the States now have statutes prohibiting the burning of the flag.[1] Most of the state statutes are patterned after the Uniform Flag Act of 1917, which in § 3 provides: "No person shall publicly mutilate, deface, defile, defy, trample upon, or by word or act cast contempt upon any such flag, standard, color, ensign or shield." Proceedings of National Conference of Commissioners on Uniform State Laws 323–324 (1917). Most were passed by the States at about the time of World War I. Rosenblatt, Flag Desecration Statutes: History and Analysis, 1972 Wash. U. L. Q. 193, 197.

---

[1] See Ala. Code § 13A–11–12 (1982); Ariz. Rev. Stat. Ann. § 13–3703 (1978); Ark. Code Ann. § 5–51–207 (1987); Cal. Mil. & Vet. Code Ann. § 614 (West 1988); Colo. Rev. Stat. § 18–11–204 (1986); Conn. Gen. Stat. § 53–258a (1985); Del. Code Ann., Tit. 11, § 1331 (1987); Fla. Stat. §§ 256.05–256.051, 876.52 (1987); Ga. Code Ann. § 50–3–9 (1986); Haw. Rev. Stat. § 711–1107 (1988); Idaho Code § 18–3401 (1987); Ill. Rev. Stat., ch. 1, ¶¶ 3307, 3351 (1980); Ind. Code § 35–45–1–4 (1986); Iowa Code § 32.1 (1978 and Supp. 1989); Kan. Stat. Ann. § 21–4114 (1988); Ky. Rev. Stat. Ann. § 525.110 (Michie Supp. 1988); La. Rev. Stat. Ann. § 14:116 (West 1986); Me. Rev. Stat. Ann., Tit. 1, § 254 (1979); Md. Ann. Code, Art. 27, § 83 (1988); Mass. Gen. Laws §§ 264, 265 (1987); Mich. Comp. Laws § 750.246 (1968); Minn. Stat. § 609.40 (1987); Miss. Code Ann. § 97–7–39 (1973); Mo. Rev. Stat. § 578.095 (Supp. 1989); Mont. Code Ann. § 45–8–215 (1987); Neb. Rev. Stat. § 28–928 (1985); Nev. Rev. Stat. § 201.290 (1986); N. H. Rev. Stat. Ann. § 646.1 (1986); N. J. Stat. Ann. § 2C:33–9 (West 1982); N. M. Stat. Ann. § 30–21–4 (1984); N. Y. Gen. Bus. Law § 136 (McKinney 1988); N. C. Gen. Stat. § 14–381 (1986); N. D. Cent. Code § 12.1–07–02 (1985); Ohio Rev. Code Ann. § 2927.11 (1987); Okla. Stat., Tit. 21, § 372 (1983); Ore. Rev. Stat. § 166.075 (1987); 18 Pa. Cons. Stat. § 2102 (1983); R. I. Gen. Laws § 11–15–2 (1981); S. C. Code §§ 16–17–220, 16–17–230 (1985 and Supp. 1988); S. D. Codified Laws § 22–9–1 (1988); Tenn. Code Ann. §§ 39–5–843, 39–5–847 (1982); Tex. Penal Code Ann. § 42.09 (1974); Utah Code Ann. § 76–9–601 (1978); Vt. Stat. Ann., Tit. 13, § 1903 (1974); Va. Code § 18.2–488 (1988); Wash. Rev. Code § 9.86.030 (1988); W. Va. Code § 61–1–8 (1989); Wis. Stat. § 946.05 (1985–1986).

The American flag, then, throughout more than 200 years of our history, has come to be the visible symbol embodying our Nation. It does not represent the views of any particular political party, and it does not represent any particular political philosophy. The flag is not simply another "idea" or "point of view" competing for recognition in the marketplace of ideas. Millions and millions of Americans regard it with an almost mystical reverence regardless of what sort of social, political, or philosophical beliefs they may have. I cannot agree that the First Amendment invalidates the Act of Congress, and the laws of 48 of the 50 States, which make criminal the public burning of the flag.

More than 80 years ago in *Halter* v. *Nebraska*, 205 U. S. 34 (1907), this Court upheld the constitutionality of a Nebraska statute that forbade the use of representations of the American flag for advertising purposes upon articles of merchandise. The Court there said:

> "For that flag every true American has not simply an appreciation but a deep affection. . . . Hence, it has often occurred that insults to a flag have been the cause of war, and indignities put upon it, in the presence of those who revere it, have often been resented and sometimes punished on the spot." *Id.*, at 41.

Only two Terms ago, in *San Francisco Arts & Athletics, Inc.* v. *United States Olympic Committee*, 483 U. S. 522 (1987), the Court held that Congress could grant exclusive use of the word "Olympic" to the United States Olympic Committee. The Court thought that this "restrictio[n] on expressive speech properly [was] characterized as incidental to the primary congressional purpose of encouraging and rewarding the USOC's activities." *Id.*, at 536. As the Court stated, "when a word [or symbol] acquires value 'as the result of organization and the expenditure of labor, skill, and money' by an entity, that entity constitutionally may obtain a limited property right in the word [or symbol]." *Id.*, at 532, quoting *International News Service* v. *Associated Press*, 248

U. S. 215, 239 (1918). Surely Congress or the States may recognize a similar interest in the flag.

But the Court insists that the Texas statute prohibiting the public burning of the American flag infringes on respondent Johnson's freedom of expression. Such freedom, of course, is not absolute. See *Schenck* v. *United States*, 249 U. S. 47 (1919). In *Chaplinsky* v. *New Hampshire*, 315 U. S. 568 (1942), a unanimous Court said:

> "Allowing the broadest scope to the language and purpose of the Fourteenth Amendment, it is well understood that the right of free speech is not absolute at all times and under all circumstances. There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Id.*, at 571–572 (footnotes omitted).

The Court upheld Chaplinsky's conviction under a state statute that made it unlawful to "address any offensive, derisive or annoying word to any person who is lawfully in any street or other public place." *Id.*, at 569. Chaplinsky had told a local marshal, "'"You are a God damned racketeer" and a "damned Fascist and the whole government of Rochester are Fascists or agents of Fascists."'" *Ibid.*

Here it may equally well be said that the public burning of the American flag by Johnson was no essential part of any exposition of ideas, and at the same time it had a tendency to incite a breach of the peace. Johnson was free to make any verbal denunciation of the flag that he wished; indeed, he was

free to burn the flag in private. He could publicly burn other symbols of the Government or effigies of political leaders. He did lead a march through the streets of Dallas, and conducted a rally in front of the Dallas City Hall. He engaged in a "die-in" to protest nuclear weapons. He shouted out various slogans during the march, including: "Reagan, Mondale which will it be? Either one means World War III"; "Ronald Reagan, killer of the hour, Perfect example of U. S. power"; and "red, white and blue, we spit on you, you stand for plunder, you will go under." Brief for Respondent 3. For none of these acts was he arrested or prosecuted; it was only when he proceeded to burn publicly an American flag stolen from its rightful owner that he violated the Texas statute.

The Court could not, and did not, say that Chaplinsky's utterances were not expressive phrases—they clearly and succinctly conveyed an extremely low opinion of the addressee. The same may be said of Johnson's public burning of the flag in this case; it obviously did convey Johnson's bitter dislike of his country. But his act, like Chaplinsky's provocative words, conveyed nothing that could not have been conveyed and was not conveyed just as forcefully in a dozen different ways. As with "fighting words," so with flag burning, for purposes of the First Amendment: It is "no essential part of any exposition of ideas, and [is] of such slight social value as a step to truth that any benefit that may be derived from [it] is clearly outweighed" by the public interest in avoiding a probable breach of the peace. The highest courts of several States have upheld state statutes prohibiting the public burning of the flag on the grounds that it is so inherently inflammatory that it may cause a breach of public order. See, e. g., State v. Royal, 113 N. H. 224, 229, 305 A. 2d 676, 680 (1973); State v. Waterman, 190 N. W. 2d 809, 811–812 (Iowa 1971); see also State v. Mitchell, 32 Ohio App. 2d 16, 30, 288 N. E. 2d 216, 226 (1972).

The result of the Texas statute is obviously to deny one in Johnson's frame of mind one of many means of "symbolic speech." Far from being a case of "one picture being worth a thousand words," flag burning is the equivalent of an inarticulate grunt or roar that, it seems fair to say, is most likely to be indulged in not to express any particular idea, but to antagonize others. Only five years ago we said in *City Council of Los Angeles* v. *Taxpayers for Vincent,* 466 U. S. 789, 812 (1984), that "the First Amendment does not guarantee the right to employ every conceivable method of communication at all times and in all places." The Texas statute deprived Johnson of only one rather inarticulate symbolic form of protest—a form of protest that was profoundly offensive to many—and left him with a full panoply of other symbols and every conceivable form of verbal expression to express his deep disapproval of national policy. Thus, in no way can it be said that Texas is punishing him because his hearers—or any other group of people—were profoundly opposed to the message that he sought to convey. Such opposition is no proper basis for restricting speech or expression under the First Amendment. It was Johnson's use of this particular symbol, and not the idea that he sought to convey by it or by his many other expressions, for which he was punished.

Our prior cases dealing with flag desecration statutes have left open the question that the Court resolves today. In *Street* v. *New York,* 394 U. S. 576, 579 (1969), the defendant burned a flag in the street, shouting "We don't need no damned flag" and "[i]f they let that happen to Meredith we don't need an American flag." The Court ruled that since the defendant might have been convicted solely on the basis of his words, the conviction could not stand, but it expressly reserved the question whether a defendant could constitutionally be convicted for burning the flag. *Id.,* at 581.

Chief Justice Warren, in dissent, stated: "I believe that the States and Federal Government do have the power to protect the flag from acts of desecration and disgrace. . . . [I]t is dif-

ficult for me to imagine that, had the Court faced this issue, it would have concluded otherwise." *Id.*, at 605. Justices Black and Fortas also expressed their personal view that a prohibition on flag burning did not violate the Constitution. See *id.*, at 610 (Black, J., dissenting) ("It passes my belief that anything in the Federal Constitution bars a State from making the deliberate burning of the American Flag an offense"); *id.*, at 615–617 (Fortas, J., dissenting) ("[T]he States and the Federal Government have the power to protect the flag from acts of desecration committed in public. . . . [T]he flag is a special kind of personality. Its use is traditionally and universally subject to special rules and regulation. . . . A person may 'own' a flag, but ownership is subject to special burdens and responsibilities. A flag may be property, in a sense; but it is property burdened with peculiar obligations and restrictions. Certainly . . . these special conditions are not *per se* arbitrary or beyond governmental power under our Constitution").

In *Spence* v. *Washington*, 418 U. S. 405 (1974), the Court reversed the conviction of a college student who displayed the flag with a peace symbol affixed to it by means of removable black tape from the window of his apartment. Unlike the instant case, there was no risk of a breach of the peace, no one other than the arresting officers saw the flag, and the defendant owned the flag in question. The Court concluded that the student's conduct was protected under the First Amendment, because "no interest the State may have in preserving the physical integrity of a privately owned flag was significantly impaired on these facts." *Id.*, at 415. The Court was careful to note, however, that the defendant "was not charged under the desecration statute, nor did he permanently disfigure the flag or destroy it." *Ibid.*

In another related case, *Smith* v. *Goguen*, 415 U. S. 566 (1974), the appellee, who wore a small flag on the seat of his trousers, was convicted under a Massachusetts flag-misuse statute that subjected to criminal liability anyone who

"publicly . . . treats contemptuously the flag of the United States." *Id.*, at 568–569. The Court affirmed the lower court's reversal of appellee's conviction, because the phrase "treats contemptuously" was unconstitutionally broad and vague. *Id.*, at 576. The Court was again careful to point out that "[c]ertainly nothing prevents a legislature from defining with substantial specificity what constitutes forbidden treatment of United States flags." *Id.*, at 581–582. See also *id.*, at 587 (WHITE, J., concurring in judgment) ("The flag is a national property, and the Nation may regulate those who would make, imitate, sell, possess, or use it. I would not question those statutes which proscribe mutilation, defacement, or burning of the flag or which otherwise protect its physical integrity, without regard to whether such conduct might provoke violence. . . . There would seem to be little question about the power of Congress to forbid the mutilation of the Lincoln Memorial. . . . The flag is itself a monument, subject to similar protection"); *id.*, at 591 (BLACKMUN, J., dissenting) ("Goguen's punishment was constitutionally permissible for harming the physical integrity of the flag by wearing it affixed to the seat of his pants").

But the Court today will have none of this. The uniquely deep awe and respect for our flag felt by virtually all of us are bundled off under the rubric of "designated symbols," *ante*, at 417, that the First Amendment prohibits the government from "establishing." But the government has not "established" this feeling; 200 years of history have done that. The government is simply recognizing as a fact the profound regard for the American flag created by that history when it enacts statutes prohibiting the disrespectful public burning of the flag.

The Court concludes its opinion with a regrettably patronizing civics lecture, presumably addressed to the Members of both Houses of Congress, the members of the 48 state legislatures that enacted prohibitions against flag burning, and the troops fighting under that flag in Vietnam who objected to its

being burned: "The way to preserve the flag's special role is not to punish those who feel differently about these matters. It is to persuade them that they are wrong." *Ante*, at 419. The Court's role as the final expositor of the Constitution is well established, but its role as a Platonic guardian admonishing those responsible to public opinion as if they were truant schoolchildren has no similar place in our system of government. The cry of "no taxation without representation" animated those who revolted against the English Crown to found our Nation—the idea that those who submitted to government should have some say as to what kind of laws would be passed. Surely one of the high purposes of a democratic society is to legislate against conduct that is regarded as evil and profoundly offensive to the majority of people—whether it be murder, embezzlement, pollution, or flag burning.

Our Constitution wisely places limits on powers of legislative majorities to act, but the declaration of such limits by this Court "is, at all times, a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative, in a doubtful case." *Fletcher* v. *Peck*, 6 Cranch 87, 128 (1810) (Marshall, C. J.). Uncritical extension of constitutional protection to the burning of the flag risks the frustration of the very purpose for which organized governments are instituted. The Court decides that the American flag is just another symbol, about which not only must opinions pro and con be tolerated, but for which the most minimal public respect may not be enjoined. The government may conscript men into the Armed Forces where they must fight and perhaps die for the flag, but the government may not prohibit the public burning of the banner under which they fight. I would uphold the Texas statute as applied in this case.[2]

---

[2] In holding that the Texas statute as applied to Johnson violates the First Amendment, the Court does not consider Johnson's claims that the statute is unconstitutionally vague or overbroad. Brief for Respondent 24–30. I think those claims are without merit. In *New York State Club Assn.* v. *City of New York*, 487 U. S. 1, 11 (1988), we stated that a facial

JUSTICE STEVENS, dissenting.

As the Court analyzes this case, it presents the question whether the State of Texas, or indeed the Federal Government, has the power to prohibit the public desecration of the American flag. The question is unique. In my judgment rules that apply to a host of other symbols, such as state flags, armbands, or various privately promoted emblems of political or commercial identity, are not necessarily controlling. Even if flag burning could be considered just another species of symbolic speech under the logical application of the rules that the Court has developed in its interpretation of the First Amendment in other contexts, this case has an intangible dimension that makes those rules inapplicable.

A country's flag is a symbol of more than "nationhood and national unity." *Ante*, at 407, 410, 413, and n. 9, 417, 420. It also signifies the ideas that characterize the society that has chosen that emblem as well as the special history that has animated the growth and power of those ideas. The fleurs-de-lis and the tricolor both symbolized "nationhood and national unity," but they had vastly different meanings. The message conveyed by some flags—the swastika, for example—may survive long after it has outlived its usefulness as a symbol of regimented unity in a particular nation.

---

challenge is only proper under the First Amendment when a statute can never be applied in a permissible manner or when, even if it may be validly applied to a particular defendant, it is so broad as to reach the protected speech of third parties. While Tex. Penal Code Ann. § 42.09 (1989) "may not satisfy those intent on finding fault at any cost, [it is] set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with." *CSC* v. *Letter Carriers*, 413 U. S. 548, 579 (1973). By defining "desecrate" as "deface," "damage" or otherwise "physically mistreat" in a manner that the actor knows will "seriously offend" others, § 42.09 only prohibits flagrant acts of physical abuse and destruction of the flag of the sort at issue here—soaking a flag with lighter fluid and igniting it in public—and not any of the examples of improper flag etiquette cited in respondent's brief.

So it is with the American flag. It is more than a proud symbol of the courage, the determination, and the gifts of nature that transformed 13 fledgling Colonies into a world power. It is a symbol of freedom, of equal opportunity, of religious tolerance, and of good will for other peoples who share our aspirations. The symbol carries its message to dissidents both at home and abroad who may have no interest at all in our national unity or survival.

The value of the flag as a symbol cannot be measured. Even so, I have no doubt that the interest in preserving that value for the future is both significant and legitimate. Conceivably that value will be enhanced by the Court's conclusion that our national commitment to free expression is so strong that even the United States as ultimate guarantor of that freedom is without power to prohibit the desecration of its unique symbol. But I am unpersuaded. The creation of a federal right to post bulletin boards and graffiti on the Washington Monument might enlarge the market for free expression, but at a cost I would not pay. Similarly, in my considered judgment, sanctioning the public desecration of the flag will tarnish its value—both for those who cherish the ideas for which it waves and for those who desire to don the robes of martyrdom by burning it. That tarnish is not justified by the trivial burden on free expression occasioned by requiring that an available, alternative mode of expression—including uttering words critical of the flag, see *Street* v. *New York*, 394 U. S. 576 (1969)—be employed.

It is appropriate to emphasize certain propositions that are not implicated by this case. The statutory prohibition of flag desecration does not "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *West Virginia Board of Education* v. *Barnette*, 319 U. S. 624, 642 (1943). The statute does not compel any conduct or any profession of respect for any idea or any symbol.

Nor does the statute violate "the government's paramount obligation of neutrality in its regulation of protected communication." *Young* v. *American Mini Theatres, Inc.*, 427 U. S. 50, 70 (1976) (plurality opinion). The content of respondent's message has no relevance whatsoever to the case. The concept of "desecration" does not turn on the substance of the message the actor intends to convey, but rather on whether those who view the *act* will take serious offense. Accordingly, one intending to convey a message of respect for the flag by burning it in a public square might nonetheless be guilty of desecration if he knows that others—perhaps simply because they misperceive the intended message—will be seriously offended. Indeed, even if the actor knows that all possible witnesses will understand that he intends to send a message of respect, he might still be guilty of desecration if he also knows that this understanding does not lessen the offense taken by some of those witnesses. Thus, this is not a case in which the fact that "it is the speaker's opinion that gives offense" provides a special "reason for according it constitutional protection," *FCC* v. *Pacifica Foundation*, 438 U. S. 726, 745 (1978) (plurality opinion). The case has nothing to do with "disagreeable ideas," see *ante,* at 409. It involves disagreeable conduct that, in my opinion, diminishes the value of an important national asset.

The Court is therefore quite wrong in blandly asserting that respondent "was prosecuted for his expression of dissatisfaction with the policies of this country, expression situated at the core of our First Amendment values." *Ante,* at 411. Respondent was prosecuted because of the method he chose to express his dissatisfaction with those policies. Had he chosen to spray-paint—or perhaps convey with a motion picture projector—his message of dissatisfaction on the facade of the Lincoln Memorial, there would be no question about the power of the Government to prohibit his means of expression. The prohibition would be supported by the legitimate interest in preserving the quality of an important

national asset. Though the asset at stake in this case is intangible, given its unique value, the same interest supports a prohibition on the desecration of the American flag.*

The ideas of liberty and equality have been an irresistible force in motivating leaders like Patrick Henry, Susan B. Anthony, and Abraham Lincoln, schoolteachers like Nathan Hale and Booker T. Washington, the Philippine Scouts who fought at Bataan, and the soldiers who scaled the bluff at Omaha Beach. If those ideas are worth fighting for—and our history demonstrates that they are—it cannot be true that the flag that uniquely symbolizes their power is not itself worthy of protection from unnecessary desecration.

I respectfully dissent.

---

*The Court suggests that a prohibition against flag desecration is not content neutral because this form of symbolic speech is only used by persons who are critical of the flag or the ideas it represents. In making this suggestion the Court does not pause to consider the far-reaching consequences of its introduction of disparate-impact analysis into our First Amendment jurisprudence. It seems obvious that a prohibition against the desecration of a gravesite is content neutral even if it denies some protesters the right to make a symbolic statement by extinguishing the flame in Arlington Cemetery where John F. Kennedy is buried while permitting others to salute the flame by bowing their heads. Few would doubt that a protester who extinguishes the flame has desecrated the gravesite, regardless of whether he prefaces that act with a speech explaining that his purpose is to express deep admiration or unmitigated scorn for the late President. Likewise, few would claim that the protester who bows his head has desecrated the gravesite, even if he makes clear that his purpose is to show disrespect. In such a case, as in a flag burning case, the prohibition against desecration has absolutely nothing to do with the content of the message that the symbolic speech is intended to convey.