**CITY OF DAYTON, Appellant,**

v.

**ESRATI, Appellee.**

[Cite as *Dayton v. Esrati* (1997), 125 Ohio App.3d 60.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 16482.

Decided Dec. 5, 1997.

*John J. Scaccia,* Dayton Chief Prosecutor, for appellant.

*Dana K. Cole* and *Richard B. Saphire,* for appellee.

WOLFF, Judge.

The city of Dayton ("the city") appeals from a judgment of the Dayton Municipal Court which dismissed with prejudice several charges brought against David Esrati.

**64**

Following his arrest at a Dayton City Commission meeting, Esrati was charged under the Dayton Revised Code of General Ordinances with two counts of criminal trespass, one count of disturbing a lawful meeting, and one count of unlawful conduct at a Commission meeting. See R.C.G.O. 133.05(A)(2), 133.05(A)(3), 137.02(A)(1), and 30.06(A)(3). Esrati pled not guilty and filed a motion to dismiss the charges, claiming that his arrest had violated his First Amendment right to freedom of expression. The trial court conducted a hearing on the motion at which the following evidence was presented.

Esrati attended Commission meetings regularly, sat in the same place at each meeting, and frequently spoke when public comment was invited. As a result, Dayton Mayor Michael Turner ("the mayor") and the other Commissioners were familiar with Esrati. Esrati was often critical of the Commission's actions.

The Commission meetings typically followed a set format. First, the Commission addressed several agenda items concerning administrative and legislative matters. Next, the Commission allowed for public comment on the administrative and legislative matters before voting. Following the period of public comment, the Commission voted and addressed other business issues. Toward the end of the meeting, the Commission allowed for another period of public comment, which was followed by comments of the City Manager and the Commissioners. During the second period of public comment, citizens could share their views on any matter of concern to them, whether or not it was on the Commission's agenda for that meeting.

The Commission held meetings on February 26 and February 28, 1996, and Esrati attended both meetings. During the February 26 meeting, Commission staff members submitted a list of proposals that, if adopted, would have curtailed citizen participation at Commission meetings. Esrati objected to these proposals and, according to the mayor, the proposals were not well received by the Commission. No action was taken on the proposals at that time, and they were not placed on the agenda for the February 28 meeting.

On February 27, Esrati notified Dayton Police Chief Ronald Lowe, with whom he was acquainted through Commission meetings, that he "was going to make a statement" at the next day's meeting. Lowe understood that the "statement" involved some sort of "head gear" and, based on an earlier encounter with Esrati at the mall, Lowe suspected that Esrati might be planning to wear Mickey Mouse ears. Lowe told Acting City Manager Maureen Pero about his conversation with Esrati shortly before the February 28 meeting. The mayor was also informed that Esrati was planning something.

On February 28, Esrati entered the Commission meeting carrying a placard and sat in his usual seat. He was not wearing anything on his head at that time.

Shortly after the meeting started, Esrati placed a ninja mask over his head. The mask was similar to a ski mask except that it had one large hole for the eyes.

The witnesses' testimony at the hearing differed about what happened at the meeting after Esrati donned the mask. The account that follows reflects the facts as found by the trial court and as recounted by most of the witnesses. The extent to which the mayor's testimony contradicted this version of events will be discussed under the second assignment of error.

Esrati made no physical gestures, noises, or other commotion after he had put on the mask. Several people who regularly attended the Commission meetings assumed that the masked man was Esrati, even if they had not seen him before he placed the mask over his head, and they did not feel threatened by him. Others either had not noticed Esrati or did not feel threatened by him, although they thought his conduct was strange. The police officers present at the meeting initially took no action in response to Esrati's conduct.

The mayor apparently noticed Esrati's mask as he was introducing the meeting's first speakers, and he laughed briefly. Once the speakers' presentation had begun, the mayor summoned Pero, had a brief, whispered conversation with her, and instructed her that Esrati should be told to remove his mask or should be removed from the meeting. The speaker paused during this conversation until the mayor indicated that she should continue with her presentation. Otherwise, the meeting continued uninterrupted.

Pero communicated the mayor's instructions to the police officers at the meeting. One of the officers approached Esrati and asked him to step outside the auditorium to discuss his mask. Esrati complied. Once in the corridor, Esrati removed his mask to talk with the officer, who explained that the mayor would not permit him to wear the mask in the auditorium. Esrati explained to the officer that he was exercising his constitutional rights and then reentered the auditorium carrying the mask.

After Esrati had returned to his seat in the front of the auditorium, he quietly donned the mask again. This time, Chief Lowe approached Esrati and requested in a whispered voice that Esrati follow him out of the auditorium. Esrati complied. Chief Lowe then told Esrati that if he wore the mask in the auditorium again he would be arrested, but that he could return to the auditorium without the mask. Esrati again explained that he was exercising his constitutional rights and that the mayor had no right to prevent him from wearing the mask. Chief Lowe returned to the auditorium. A few moments later, Esrati took one or two steps into the auditorium with the mask on his head, and he was arrested by the police officers.

Although the speakers testified that they had been aware of some commotion in the audience, the Commission meeting continued without interruption throughout the police officers' exchanges with Esrati.

The evidence also established that Commission members had attended a meeting wearing robes and head gear symbolizing ethnic pride several months after Esrati's arrest without objection.

Following the hearing, the trial court concluded that Esrati's conduct had been passive, symbolic speech with a "capacity to send a coherent political message" and that it was protected by the First Amendment. The trial court also concluded that the city's actions had been motivated by the content of Esrati's statement—his dissatisfaction with the Commission—and had served no compelling state interest. Thus, the trial court granted Esrati's motion to dismiss the charges against him.

The city asserts three assignments of error on appeal:

"I. The trial court committed prejudicial error by applying a test for symbolic speech not recognized at law and which did not require the appellee to establish the particularized message of his alleged symbol or great likelihood of understanding of the particularized message by the audience."

The city claims that the trial court misapplied Supreme Court case law defining symbolic speech entitled to First Amendment protection. Specifically, the city contends that symbolic speech is protected only if it contains a particularized message which, in the surrounding circumstances, is likely to be understood by those who view it. The city contends that the message conveyed by Esrati's conduct at the Commission meeting, if any, was not particular and was incapable of being understood by those who viewed it. Esrati, on the other hand, claims that his conduct conveyed his dissatisfaction with the Commission and with a proposal that would have further limited public participation at Commission meetings by banishing the "faces of the public." Therefore, Esrati contends that his conduct fell within the Supreme Court's definition of symbolic speech as it has been developed in case law.

The Supreme Court has long recognized that "conduct may be 'sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments' " to the United States Constitution. *Texas v. Johnson* (1989), 491 U.S. 397, 404, 109 S.Ct. 2533, 2539, 105 L.Ed.2d 342, 353, citing *Spence v. Washington* (1974), 418 U.S. 405, 409–411, 94 S.Ct. 2727, 2730, 41 L.Ed.2d 842, 846–847. In deciding whether conduct possessed sufficient communicative elements to bring the First Amendment into play, the Supreme Court has considered whether an intent to convey a particularized message was present

and whether the likelihood was great that the message would be understood by those who viewed it. *Id.*

As a preliminary matter, we note that the Supreme Court has not applied a "particularized message" test in the manner advocated by the city. The city has cited no cases in which the Supreme Court found that expressive conduct fell outside the definition of symbolic speech because the message reflected by the conduct was not particular enough, and we are aware of none. Moreover, it appears that some of the conduct that the Supreme Court has treated as symbolic, protected speech would not have passed constitutional muster if the court had required as much particularity in the message as the city suggests. For example, the Supreme Court has held that wearing black arm bands to express objections to government activities is "akin to 'pure speech.'" *Tinker v. Des Moines Indep. Community School Dist.* (1969), 393 U.S. 503, 508, 89 S.Ct. 733, 737, 21 L.Ed.2d 731, 738. The court has also held that acts which involve the destruction or desecration of an American flag may be protected, symbolic speech if done for the purpose of protesting governmental activities or policies. *Johnson, supra; Spence, supra.* Although the court considered the political context in which these symbolic statements were made, *e.g.*, during the Vietnam War, the court seemed to accept general dissatisfaction with the government's conduct as a sufficiently "particular" message to justify First Amendment protection.

■ In the context of the Commission meeting and Esrati's persistent criticism of the Commission's actions, the trial court concluded that Esrati's mask conveyed his dissatisfaction with the Commission. We agree with this conclusion. Moreover, based on the Supreme Court case law discussed *supra*, we conclude that Esrati's message of dissatisfaction with the Commission was sufficiently particular to entitle his symbolic speech to First Amendment protection even if his more specific message—his objections to proposed changes in public participation at meetings—was not apparent to those who viewed it.

The first assignment of error is overruled.

"II. Assuming *arguendo* that the appellee engaged in symbolic speech, the trial court committed prejudicial error by failing to adhere to proper methodology for assessing government regulation of symbolic conduct which resulted in the failing to identify what constitutes a government regulation, applying an incorrect definition of content neutrality in assessing the impact of such regulation, and in ignoring established precedent defining a substantial or important government interest."

The city contends that the trial court refused to recognize the mayor's authority to regulate the conduct of people who attend Commission meetings and that, in so doing, it misapplied the test set forth in *United States v. O'Brien*

(1968), 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672. The city also asserts that the trial court failed to recognize the legitimate, content-neutral reasons for Esrati's arrest.

In *O'Brien, supra,* the Supreme Court held that, when "speech" and "nonspeech" elements are combined in the same course of conduct, a government regulation directed at the nonspeech element can justify incidental limitations on First Amendment freedoms if (1) it is within the constitutional power of the government, (2) it furthers an important or substantial governmental interest, (3) the governmental interest is unrelated to the suppression of free expression, and (4) the incidental restriction on First Amendment freedoms is no greater than essential to the furtherance of that interest. *Id.* at 376–378, 88 S.Ct. at 1679, 20 L.Ed.2d at 679–681. The applicability of this relatively lenient standard, however, has been strictly limited to those cases in which the government interest is unrelated to the suppression of free expression. *Johnson,* 491 U.S. at 406–408, 109 S.Ct at 2541, 105 L.Ed 2d at 354–356. Thus, the *O'Brien* test is akin to the standard of review applied to time, place, and manner restrictions. *Id.; Clark v. Community for Creative Non–Violence* (1984), 468 U.S. 288, 296–299, 104 S.Ct. 3065, 3071, 82 L.Ed.2d 221, 228–231. The government may not proscribe particular conduct simply because it has expressive elements. *Johnson, supra,* 491 U.S. at 404–406, 109 S.Ct. at 2540, 105 L.Ed.2d at 353–355. "A law *directed at* the communicative nature of conduct must, like a law directed at speech itself, be justified by the substantial showing of need that the First Amendment requires." (Emphasis *sic.*) *Id.* at 406, 109 S.Ct. at 2541, 105 L.Ed.2d at 355, citing *Community for Creative Non–Violence v. Watt* (C.A.D.C. 1983), 703 F.2d 586, 622–623 (Scalia, J., dissenting).

The city claims that the trial court erred in applying the first element of the *O'Brien* test because it did not recognize the mayor's authority to regulate the conduct of those attending the Commission meeting. We disagree with the city's assessment that the trial court's decision was based upon its failure to recognize the mayor's authority to conduct Commission meetings. There is nothing in the decision to support such a conclusion. Rather, the trial court concluded that, at the mayor's direction, "general laws [had been] applied in a selective manner" due to the message conveyed by Esrati's conduct. Thus, for purposes of our analysis, we will assume that the city, through its mayor, had the authority to regulate conduct that was unduly disruptive of Commission meetings. The question remains, however, whether the city's actions in this case exceeded that authority and violated Esrati's First Amendment rights.

The city asserts that four governmental interests were served by prohibiting Esrati from wearing a mask during the Commission meeting. These interests were (1) maintaining decorum, (2) maintaining order and control, (3) afford-

ing those scheduled to make presentations the opportunity to exercise their First Amendment rights without distraction or hindrance, and (4) allaying apprehension or fear for physical safety which arose or may have arisen in those viewing Esrati's conduct. We will discuss the first three interests together because of their substantial similarity.

The city insists that the mayor's actions clearly fell within his authority to control the agenda of Commission meetings, to ensure orderly proceedings at those meetings, and to protect the rights of all citizens who are interested in participating. In support of this argument, the city relies upon several cases related to government officials' efforts to keep order at public meetings. See *White v. Norwalk* (C.A.9, 1990), 900 F.2d 1421; *Jones v. Heyman* (C.A.11, 1989), 888 F.2d 1328; *Wright v. Anthony* (C.A.8, 1984), 733 F.2d 575; *Devine v. Port Jefferson* (E.D.N.Y.1994), 849 F.Supp. 185; *Kalk v. Woodmere* (1985), 27 Ohio App.3d 145, 27 OBR 177, 500 N.E.2d 384. These cases are factually distinguishable, however, because they involved such conduct as citizens refusing to yield the floor, to abide by time limits, or to limit comments to agenda items. In other words, the government officials in those cases acted in response to vocal and/or physical disruptions that prevented the meaningful or orderly continuation of the public meetings. The alleged disruption caused by Esrati's conduct was clearly of a different nature because the trial court found that Esrati "remained seated, made no physical gestures, made no speeches, no noises or any other commotion, but rather, sat silently," and that the meeting continued notwithstanding his conduct and the mayor's response to it. Thus, we must determine whether the trial court reasonably rejected the city's claim that the disruption caused by Esrati's conduct justified his arrest in the interest of maintaining order at the Commission meeting.

Conflicting testimony was presented in the trial court regarding the nature and extent of the disruption caused by Esrati when he donned the ninja mask. As discussed *supra*, the testimony of the police officers, the acting city manager, and two speakers at the meeting was fairly consistent. Those who regularly attended Commission meetings testified that they were familiar with Esrati, that he attended the meetings frequently, and that he always sat in the same location at the meetings. Even those who had not seen Esrati before he donned the mask testified that they had had little doubt about the hooded man's identity. Although six police officers were present at the meeting, none took any action in response to Esrati's conduct until instructed to do so by the mayor. The officers testified that they did not believe that Esrati had posed any threat, that there had been no reaction to Esrati's mask from others in attendance, that Esrati had made no commotion, noise, or speeches, and that the meeting had not been interrupted by his conduct. The police chief testified that he knew of ongoing

discussions between Esrati and the mayor about Esrati's concerns about city affairs. The testimony of the acting city manager and the speakers did not evince that they had been in fear for their safety at any time during the meeting. Indeed, these witnesses had not even noticed Esrati before the mayor took steps to have him removed. The testimony also established that the meeting was interrupted at one point by the mayor's discussion with the acting city manager about having Esrati removed, but not by Esrati's conduct itself.

The mayor's testimony differed from that of the other witnesses. The mayor testified that he was unsure whether Esrati was the person wearing the mask and that he was "greatly" concerned and afraid because the man looked like a "terrorist." He also denied understanding the object or nature of Esrati's criticism of the Commission. In response to videotape evidence which appeared to show the mayor laughing when he first saw Esrati, see Decision and Entry at 3, the mayor stated that he had actually noticed Esrati before that moment and that his laughter was part of an attempt to compose himself and "to figure out * * * what to do next because it was so disruptive." The mayor denied that he had ordered Esrati's arrest and denied that Esrati had remained silent during the meeting.

Given this conflicting testimony, the extent to which Esrati had, in fact, inspired fear among those present and had disrupted the Commission meeting was a question of fact to be determined by the trial court. The trial court found that the testimony describing "a tense city commission meeting where 'the defendant was dressed as a terrorist/assassin'" and where "the alarm of defendant's wearing a 'Ninja mask' required swift action" was merely "verbal paint" and was not credible. There was ample support for the trial court's conclusion in the record, and we will not disturb this factual determination on appeal. Because Esrati's conduct did not genuinely interfere with the Commission meeting, the city's claim that it was advancing substantial government interests—the maintenance of decorum and order at a public meeting and the protection of others' rights to speak—when it arrested Esrati was properly rejected.

The fourth governmental interest asserted by the city as justification for regulating Esrati's conduct was to allay fear for physical safety that arose or may have arisen in those viewing a masked man at the Commission meeting. The trial court apparently rejected this justification for the city's action based on its conclusion that the Commission meeting was not fraught with tension and alarm, as discussed *supra*. Again, this conclusion was supported by the record. More important, the Supreme Court has held that "in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Tinker*, 393 U.S. at 508, 89 S.Ct. at 737, 21 L.Ed.2d at 739.

Because the city failed to establish a basis for regulating Esrati's expressive conduct that was content-neutral and served a substantial government interest, the trial court reasonably concluded that the city's actions had been motivated by Esrati's message. Specifically, the trial court found that "general laws [had been] applied in a selective manner," and that Esrati's arrest "was a reaction to the expression itself, not the enforcement of any independent, substantial government interest." Based on this conclusion, the *O'Brien* test upon which the city relies was not applicable to the city's actions in this case. As discussed *supra*, the relatively lenient standard of *O'Brien* for reviewing government conduct has been strictly limited to those cases in which the government interest is unrelated to the suppression of free expression. *Johnson*, 491 U.S. at 406–408, 109 S.Ct. at 2541, 105 L.Ed.2d at 354–356. The city failed to establish that its actions were not directed at the communicative nature of Esrati's conduct. Thus, exacting scrutiny was required. See *Perry Edn. Assn. v. Perry Local Edn. Assn.* (1983), 460 U.S. 37, 45–46, 103 S.Ct. 948, 955, 74 L.Ed.2d 794, 804–805; *United States v. Eichman* (1990), 496 U.S. 310, 317–318, 110 S.Ct. 2404, 2409, 110 L.Ed.2d 287, 295–296; *Boos v. Barry* (1988), 485 U.S. 312, 321–323, 108 S.Ct. 1157, 1164, 99 L.Ed.2d 333, 344–346. The trial court properly determined that the city's actions could not survive such exacting scrutiny.

The second assignment of error is overruled.

"III. At the time the regulation was issued prohibiting the appellee from wearing a hood while others were addressing the Commission during the business portion of the meeting a limited public forum existed which was not open to the appellee and the content neutral regulation was reasonable but even assuming arguendo full public forum rights the regulation was a valid time, place and manner restriction."

The city's argument under this assignment of error relates to the distinction, for purposes of regulation of expressive activity, between a public forum and a nonpublic forum. The city claims that its Commission meetings constitute a public forum only when the Commission has intentionally opened the floor to the public, and that it was free to regulate Esrati's expressive conduct at all other times during the meeting so long as the regulation was reasonable.

The Supreme Court has identified three types of fora: the traditional public forum, the limited public forum, and the nonpublic forum. *Cornelius v. NAACP Legal Defense & Edn. Fund* (1985), 473 U.S. 788, 802–803, 105 S.Ct. 3439, 3449, 87 L.Ed.2d 567, 579–581. Traditional public fora are places such as streets and parks "which 'have immemorially been held in trust for the use of the public and, time out of mind, have been used for the purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Perry*, 460 U.S. at 45, 103 S.Ct. at 954–955, 74 L.Ed.2d at 804, quoting *Hague v.*

*CIO* (1939), 307 U.S. 496, 512–515, 59 S.Ct. 954, 963, 83 L.Ed. 1423, 1435–1437. Limited public fora consist of public property that the government has opened for use by the public as a place for expressive activity. Examples of this type of forum include a university meeting facility available to student groups and a municipal auditorium or a city-leased theatre designed for and dedicated to expressive activities. *Cornelius, supra,* citing *Widmar v. Vincent* (1981), 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440; *Ward v. Rock Against Racism* (1989), 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661; *Southeastern Promotions, Ltd. v. Conrad* (1975), 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448. Nonpublic fora consist of government property to which the public has not been granted general access and the nature of which is inconsistent with expressive activity. Examples include military bases, federal workplaces, and internal school mail facilities. See *Greer v. Spock* (1976), 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505; *Cornelius, supra; Perry, supra.* The government may close nonpublic fora to all but official business if it chooses. *Id.,* 460 U.S. at 45–48, 103 S.Ct. at 955–956, 74 L.Ed.2d at 804–807.

As the city points out, different standards apply to government efforts to regulate speech in the various fora. In a public or a limited public forum, the government may enforce a content-based exclusion only if it can show that its regulation is necessary to serve a compelling state interest and that the regulation is narrowly drawn to achieve that end. *Perry,* 460 U.S. at 45–46, 103 S.Ct. at 955, 74 L.Ed.2d at 804–805. In these fora, time, place and manner regulations are permissible if they are content-neutral, narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication. *Id.* A lesser standard applies to a nonpublic forum. There, in addition to time, place, and manner regulations, the government may reserve the forum for its intended purposes as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose a speaker's view. *Id.*

The city claims that the Commission meeting constituted a nonpublic forum during the portions of the agenda when public comment was not permitted and a public forum when public comment was permitted. Therefore, the city claims that its regulation of Esrati's conduct during the nonpublic portions of the meeting needed only to be reasonable, and that the trial court erred in applying a stricter standard. This argument is without merit for two reasons. First, the Supreme Court has not endorsed the city's view that the nature of a forum can fluctuate from one moment to the next. Indeed, the court has focused on the general nature or purpose of a building or portion of a building, a thoroughfare, a communication system, or a recreational area in determining the nature of a forum, not on any one particular activity being conducted there. See, *e.g., Ward;*

*Cornelius* and *Perry, supra.* See, also, *Monterey Cty. Democratic Cent. Commt. v. United States Postal Serv.* (C.A.9, 1987), 812 F.2d 1194; *Pritchard v. Carlton* (S.D.Fla.1993), 821 F.Supp. 671. Thus, we reject the city's contention that its meeting could have constituted a public forum only part of the time.

Second, we disagree with the city's position that the Commission meeting was a nonpublic forum except during the portions open for public comment. The public nature of the legislative process and the right of citizens to participate in and voice their opinions about that process are at the heart of democratic government. Indeed, all meetings of the Commission were required to be public. R.C.G.O. 30.04. A meeting of elected government officials, when opened to the public, is a limited public forum for discussion of subjects related to the duties of those officials. *Hansen v. Westerville City School Dist.* (Nov. 7, 1994), C.A.6 Nos. 93–3231 and 93–3303, unreported, 1994 WL 622153, citing *Madison Joint School Dist. v. Wisconsin Emp. Relations Comm.* (1976), 429 U.S. 167, 177–179, 97 S.Ct. 421, 428, 50 L.Ed.2d 376, 385–387. Moreover, in our view, the government property at issue—the auditorium in the city hall—has, by its nature, been designated by the government for use by the public for assembly and speech, for use by certain speakers, and for discussion of certain subjects. Therefore, we reject the city's contention that its meeting was, at any point, a nonpublic forum.

The government may not impose viewpoint-based restrictions on expression in a limited public forum unless those restrictions serve a compelling state interest and are narrowly drawn to achieve that end. *Perry*, 460 U.S. at 45–46, 103 S.Ct. at 955, 74 L.Ed.2d at 804–805. The city failed to demonstrate that its action satisfied this requirement, as discussed under the second assignment of error.

Moreover, we recognize that even in a nonpublic forum, the city would have been required to demonstrate that its regulation of Esrati's conduct was not a viewpoint-based effort to suppress expression. *Id.* The city also failed to satisfy this requirement.

The third assignment of error is overruled.

The judgment of the trial court will be affirmed.

*Judgment affirmed.*

FREDERICK N. YOUNG, P.J., and GRADY, J., concur.