**Ethan SPIER, Plaintiff,**

**v.**

**Donald ELAESSER, Defendant.**

**No. C–1–01–054.**

United States District Court, S.D. Ohio, Western Division.

April 1, 2003.

---

Robert Brand Newman, Lisa Talmadge Meeks, Newman & Meeks Co. LPA, Cincinnati, OH, for Plaintiff.

Stephen S. Lazarus, Hardin Lefton Lazarus & Marks LLC, Thomas James Harris, III, Cincinnati City Solicitor's Office, Cincinnati, OH, for Defendant.

## ORDER

SHERMAN, United States Magistrate Judge.

### INTRODUCTION

Plaintiff, Ethan Spier ("Plaintiff"), claims his rights under the United States Constitution were violated on November 18, 2002 when Defendant, Cincinnati Police Officer Donald Elaesser ("Defendant"), arrested him for engaging in a chant while protesting on a public square in downtown Cincinnati, Ohio. Plaintiff was charged with disorderly conduct. During his criminal trial in the Hamilton County Municipal Court, the Judge dismissed the charge against Spier at the close of the prosecution's case due to insufficient evidence. *See* doc. 1 at 2 (*citing* Ohio R.Crim. P. 29).

This action is brought by plaintiff pursuant to 42 U.S.C. § 1983 (First Amended Complaint ¶ 26)[1]. Plaintiff also claims that the City of Cincinnati had a policy of arresting protestors without probable cause and in the absence of any violation of

---

1. A state tort claim of Malicious Criminal Prosecution brought by Plaintiff (First Amended Complaint ¶ 27) was voluntarily dismissed by Plaintiff (Tr. Pg. 152). This was affirmed by the Court in its ruling on Defendant's oral motion to dismiss (Tr. Pg. 155).

law, which violated Plaintiff's rights under the First and Fourteenth amendments of the United States Constitution (First Amended Complaint ¶ 29).[2] Additionally, Plaintiff seeks attorney's fees under 42 U.S.C. § 1988 (First Amended Complaint VIII., c) A trial to the court was held on September 30, and October 1, 2002. The parties have both consented to entry of final judgment by a United States Magistrate Judge. (Doc. 16).

## FINDINGS OF FACT

### A. *Background*

From November 16 through November 18, 2002, a group of Chief Executives of corporations in the United States and Europe met in Cincinnati, Ohio. This group, known as the TransAtlantic Business Dialogue (TABD), attracted many protestors who came to Cincinnati to voice their concerns about TABD's policies. In anticipation of large numbers of protestors at this conference, and in an effort to anticipate and minimize potential disruption, the Cincinnati Police Department ("CPD") began planning for this event many months in advance. One of the planning decisions made by the CPD, which had proven successful in other cities in similar situations, was to place police officers with helmets and related protective gear in positions of high visibility where protest activities were scheduled to be held. Plaintiff, a young college student who had recently taken a leave of absence from his schooling to pursue other interests before returning, had disagreements with TABD policies and traveled to Cincinnati on this weekend to "try to just educate people." Tr.pg.100, lines 19–23.

### B. *The Rally*

On November 18, 2000, the third day of the conference, a group of the protestors, having obtained a permit, held a rally on Fountain Square, a large public area located in the downtown business district of Cincinnati. The entire rally area was surrounded by barricades with only one controlled entrance and exit point. Police officers were stationed at this point and any one seeking entry to the rally had to consent to a pat down and brief search of any items they were carrying. The purpose of this procedure was to uncover contraband, such as spray paint cans, sling shots, or ball bearings; items which had been used by protestors the day before and which had caused property damage.

On this day, Defendant was assigned to a "S.W.A.T." team at Fountain Square monitoring the movement of the crowd. Defendant's squad leader with the S.W.A.T. team was a Sergeant Hall. The square and the surrounding area were crowded with protestors and police officers.(see Plaintiff's exhibit 4, videotape). Police Officers stood in front of a barricade on both sides of the control entry point, mingled in the crowd, stood on or near adjacent street corners, and several sat nearby on horseback. The Police Officers were calm and professional in appearance. The crowd was peaceful.

### C. *The Arrest*

The videotape shows Plaintiff, standing in an area outside of the rally, telling people in the crowd they did not have to consent to be searched before entering Fountain Square; that there were lawyers coming; and that the searches were un-

---

**2.** While the City of Cincinnati was technically made a Defendant in this case (*see* docs. 11, 12), neither party offered evidence or argument in support of or against this claim, and both parties agreed on the record that the City of Cincinnati was not a Defendant in this lawsuit (*see* Tr. pg. 79, lines 21–25)

constitutional. He suggested that no one consent to be searched; that the searches were totally illegal; and that everyone should wait until the lawyers arrived. (Exhibit 4, *Id.*)

After a period of panning the crowd and observing some conversations, the videotape later shows a woman criticizing the police for requiring people to consent to be searched before entering Fountain Square. She said to the police officers, "You officers are a disgrace to America....People in the United States shouldn't have to carry passbooks or passports or anything else in order to peaceably gather on a Saturday afternoon in their own town....It's a total outrage....You should be ashamed of yourselves." (Exhibit 4, *Id.*) She voiced her criticisms for approximately one minute. The woman did not engage in chanting and did not use profanity. No one joined her in voicing these criticisms. Police officers did not interrupt her or in any way prohibit her from speaking out in this manner.

Just as the woman finished, Plaintiff began to loudly chant "this is what a police state looks like." Others in the crowd began joining in. This chant continued for approximately one minute. While others chanted, Plaintiff yelled for the first time, "two, four, six, eight, fuck the police state." At this point, Sergeant Hall calmly approached Plaintiff and stated to him, "Do you want to go into this facility? If not, you'll have to move." In response, Plaintiff turned away from the Officer and said something akin to "I'm going to walk." Within moments, Plaintiff returned and began chanting, "Two, four, six, eight, fuck the police state." A number of people began to follow Plaintiff as he began to walk in a circle, all yelling the same chant. This lasted for fifteen to twenty seconds when Defendant then placed Plaintiff under arrest for disorderly conduct. Exhibit 4, *Id.* Prior to making the arrest, Defendant inquired of Sergeant Hall whether an arrest of Plaintiff should be made. Sergeant Hall ordered that it should. Tr. pg. 174, lines 7–25; pg. 175, lines 1–3.

## ANALYSIS

Plaintiff brings this action pursuant to 42 U.S.C. § 1983, claiming that Defendant, under color of state law, deprived Plaintiff of his rights, privileges and immunities secured by the First Amendment to the United States Constitution.

The Free Speech Clause of the First Amendment provides, "Congress shall make no law ... abridging the freedom of speech...." [3] The First Amendment protects not only spoken words, but also most conduct that is used to express a particular message.[4] However, this protection is not absolute. The First Amendment does not,

---

**3.** The Fourteenth Amendment makes this limitation applicable to the states, *Gitlow v. New York*, 268 U.S. 652, 666, 45 S.Ct. 625, 69 L.Ed. 1138 (1925), and to their political subdivisions, *Lovell v. City of Griffin*, 303 U.S. 444, 450, 58 S.Ct. 666, 82 L.Ed. 949 (1938).

**4.** A clear example of this appears in *Texas v. Johnson*, 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989), where the Supreme Court held, in part, that Johnson's act of burning the United States flag constituted expressive conduct protected by the First Amendment. *Id.* at 404, 109 S.Ct. 2533. Other examples of constitutionally protected expressive conduct are plentiful: *United States v. Grace*, 461 U.S. 171, 176, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983) (peaceful picketing constituted protected conduct); *Tinker v. Des Moines Indep. Sch. Dist.*, 393 U.S. 503, 505, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (wearing black armbands to protest Vietnam War constituted protected conduct); *Brown v. Louisiana*, 383 U.S. 131, 141–42, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966) (sit-ins by African–Americans in a "whites only" area to protest racial segregation constituted protected conduct).

under all circumstances, preclude a police officer from intervening when a citizen speaks or engages in expressive conduct. This is so because "certain well-defined and narrowly limited classes of speech," *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), play "no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Id.* at 572, 62 S.Ct. 766.

■ One narrowly limited category of unprotected speech arises when "the words are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress [or a state or city] has a right to prevent." *Schenck v. United States*, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919).[5]

These substantive evils include "not only violent acts but also acts and words likely to produce violence in others. No one would have the hardihood to suggest that the principle of freedom of speech sanctions incitement to riot.... When clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threats to public safety, peace, or order appears, the power of the State to prevent or punish is obvious." *Feiner v. New York*, 340 U.S. 315, 320, 71 S.Ct. 303, 95 L.Ed. 295 (1951)(*quoting Cantwell v. Connecticut*, 310 U.S. 296, 308, 60 S.Ct. 900, 84 L.Ed. 1213 (1940)); *see Terminiello v. Chicago*, 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 (1949). The limited scope of this category of unprotected speech is exemplified by *Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969), where the Court held

that the First Amendment protects a speaker who advocates the future use of force or violation of law "except where such advocacy is directed to inciting or producing imminent lawless action and is likely to produce such action." 395 U.S. at 447, 89 S.Ct. 1827.

■ To determine whether the Free Speech Clause of the First Amendment protects the speech or conduct at issue in a particular case, the Court must consider the particular events and circumstances that occurred near the time and at the moment of the speaker's arrest. *E.g., Hess v. Indiana*, 414 U.S. 105, 107–09, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973); *Cantwell*, 310 U.S. at 308–09, 60 S.Ct. 900; *Sandul v. Larion*, 119 F.3d 1250, 1255–56 (6th Cir.1997); *cf. Schenck*, 249 U.S. at 52, 39 S.Ct. 247 ("the character of every act depends upon the circumstances in which it is done.").

■ At the moment of Plaintiff's arrest, his conduct and chanting were constitutionally protected speech under the Free Speech Clause of the First Amendment. The use of the word "fuck" is protected here. *See Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (invalidating under the First Amendment a state prosecution for disturbing the peace by wearing, in a courthouse corridor, a jacket bearing the words "Fuck the Draft"). *See also Hess v. Indiana*, 414 U.S. 105, 107, 94 S.Ct. 326, 38 L.Ed.2d 303, (1973) (statement that "We'll take the fucking street later (or again)" at an anti-war demonstration cannot be punished as obscene). Nor did Plaintiff's expressions amount to "fighting words"; words which "have a direct tendency to cause acts of violence by the person to whom, individual-

---

**5.** Justice Holmes's famous example that shouting "fire in a theater" is not protected speech. *Id.* at 52; 39 S.Ct. 247.

ly, the remark is addressed." *Gooding v. Wilson,* 405 U.S. 518, 524, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972). Plaintiff did not address his chant toward any particular individual, nor is there any evidence of any one within earshot of him showing any signs of anger or violent reaction. (Exhibit 4, *Id.*). It is well settled that the First Amendment protects verbal criticism, challenges, and profanity directed at police officers unless the speech is "shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." *City of Houston v. Hill,* 482 U.S. 451, 461, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987) (*quoting Terminiello v. Chicago,* 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 (1949)).

By chanting loudly "this is what a police state looks like" for approximately one minute, and then chanting loudly "two, four, six, eight, fuck the police state" for fifteen to twenty seconds, before he was arrested, plaintiff was protesting the police requirement of a pat down and/or search in order to enter the rally on Fountain Squire. At the time of his arrest, there was no evidence that his speech presented a clear and present danger of any violent reaction by the crowd or any other serious substantive evil. (Exit 4, *Id.*).

Plaintiff's First Amendment right of free speech was violated by his arrest.

## QUALIFIED IMMUNITY

Defendant has pleaded the affirmative defense of quality immunity (Answer, ¶ 10). Qualified immunity is a defense to liability in a civil lawsuit which is available to government officials who perform discretionary functions if their alleged conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *See Harlow v. Fitzgerald,* 457

U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity is an affirmative defense which must be affirmatively pleaded. *Kennedy v. City of Cleveland,* 797 F.2d 297, 300 (6th Cir.1986). This defense can be raised by a defendant "at various stages of the litigation including at the pleading stage in a motion to dismiss, after discovery in a motion for summary judgement, or as an affirmative defense at trial." *English v. Dyke,* 23 F.3d 1086, 1089 (6th Cir.1994).

A police officer is entitled to qualified immunity if the right alleged to be breached by the officer was not clearly established at the time of the offense, or if established, the right is one that a reasonable person in the officer's position could fail to realize would violate an individuals' rights. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). In ruling on Defendant's defense of qualified immunity, the Court must utilize a two pronged inquiry as follows: (1) whether the facts alleged ( the facts *found* in this case) show the officer's conduct violated a constitutional right, and (2) whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted by Defendant in this case. *See Saucier v. Katz,* 533 U.S. 194, 201–02, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

The first prong of this inquiry has been established. *Supra.* The Court also finds Defendant has satisfied the second prong of the inquiry; that a reasonable officer, under the circumstances of this case, could fail to realize Plaintiff's First Amendment rights were violated.

On the day in question, the Fountain Square area was crowded with protestors and police officers. Defendant was aware that TABD conferences in other cities had "been met with large protesting

groups which had, in some cases, involved much violence and damage" (Tr. p. 50), and that some disruption and property damage caused by the protestors had taken place in Cincinnati the previous day. (Tr. pgs. 54, 169).

Defendant believed Plaintiff was trying to incite the crowd. Plaintiff had been warned by Sergeant Hall, Defendant's superior officer, to enter the rally or move on. Instead, Defendant testified regarding Plaintiff's actions as follows, "He was warned at that point. And it was not much longer after that that he began the chant.... It was a sequence of events that, to me, in my perception, would have led to a further problem" (Tr. p. 84); " ....he has a right to his own opinions, but once you start to get a crowd to become disorderly, and that disorderly crowd can leap into a mob. We're in a riot situation. I'm familiar with this extent— I've been faced with this several times" (Tr. p. 77); and "Where you're screaming it out as loud as you can, you're having others join you in this same thing, and we've—like I've indicated before, this is the kind of crowd that has become, not could, had become disorderly in prior days where damage has occurred."

The videographer, called as a witness by Plaintiff, testified that she believed Plaintiff was trying to rev up the crowd. (Tr. pg. 35–36). Plaintiff's actions at the scene, captured by the video, strongly suggests that he was attempting to stir up the crowd. *See* Exhibit 4 *Id.* While the Court believes, that at the time Plaintiff was arrested, he had not stirred up the crowd past the point of the First Amendment's protection of his speech, a reasonable police officer, based upon the total circumstances confronted by Defendant, could reach a different conclusion. This conclusion is reinforced by the fact that Defendant, following required police procedures, sought permission from Sergeant Hall, his commanding officer, to arrest Plaintiff, and was directed to do so. (Tr. pg. 174–75). This Court follows the view expressed in *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), where the Supreme Court held, "We have recognized that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable."

Plaintiff argues that Defendant waived the defense of qualified immunity. (Doc. 34). The Court disagrees. Defendant pleaded qualified immunity as an affirmative defense in his answer (¶ 10); he raised this issue at trial, albeit toward the end—during closing argument. While it would have been far preferable, in carrying out the full purpose of the doctrine of qualified immunity, to have raised it as a defense long before trial, the requirements for asserting it, as spelled out in *English v. Dyke,* 23 F.3d at 1089, have been met.

## CONCLUSION

Plaintiff's constitutional right of free speech was violated due to his arrest by Defendant, but because it would not be clear to a reasonable police officer that Defendant's conduct was unlawful in the situation he confronted, Defendant has a valid defense under the doctrine of qualified immunity.

Judgment for the Defendant is granted on all claims.

IT IS SO ORDERED.