**Frederick S. SHUGER and Roseanne Shuger, Appellants–Defendants,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 64A03–0509–CR–456.**

Court of Appeals of Indiana.

Jan. 17, 2007.

4. *See* www.census.gov

James A. Morsch, Mark Schwartz, Chicago, IL, John M. Lyons, Valparaiso, IN, Attorneys for Appellants.

Steve Carter, Attorney General of Indiana, Ryan D. Johanningsmeier, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

MATHIAS, Judge.

Frederick and Rosanne Shuger (the "Shugers") were each convicted in Porter Superior Court of two Class C misdemeanors for violating Indiana's Hunter Harassment Act. On appeal, they raise multiple issues, which we consolidate and restate as:

I. Whether Indiana's Hunter Harassment Act is constitutional; and

II. Whether the State presented sufficient evidence to support the Shugers' convictions under the Hunter Harassment Act.

We affirm.

### Facts and Procedural History[1]

In 2001, the Beverly Shores Town Board repealed its anti-hunting ordinance to provide for culling of its overpopulated deer. The Board established an "urban deer zone" in which it was legal to bow-hunt deer during certain prescribed days and hours on lands owned by private individuals who had granted permission for bow hunting on their properties. The Shugers had attended Town Board meetings where the issue of repealing the town's anti-hunting ordinance was discussed, and they had vigorously participated in protests against hunting in the neighboring state park.

On October 5, 2001, Jeffrey Valovich ("Valovich") complained to Department of Natural Resources Officer Roger Bateman ("Officer Bateman") that Frederick Shuger ("Frederick") had threatened him the previous day while he was field dressing a deer he had killed in Beverly Shores. Officer Bateman subsequently went to the Shugers' home to interview them. Frederick admitted to Officer Bateman that he had an altercation with Valovich but denied having threatened him. Frederick was charged with intimidation stemming from this incident. Frederick is not challenging his conviction for intimidation in this appeal.

In early November 2001, Officer Bateman received another complaint from hunters James Myers ("Myers") and Dan-

iel Uzelac ("Uzelac"). Myers and Uzelac had been given permission by Beverly Shores residents Phil and Carol Dickerman to hunt white tail deer on their property as allowed under the town's law. Myers and Uzelac told Officer Bateman, and later testified, that Frederick had confronted them on November 5, 2001, while they were unpacking their hunting gear on a public roadway in Beverly Shores. Frederick had confronted the hunters with expletives, and Uzelac said he was "like a bully looking for trouble." Tr. p. 252.

On a second hunting expedition on November 7, 2001, Myers and Uzelac also witnessed Frederick and Rosanne Shuger ("Rosanne") slowly driving down a nearby gravel road. The Shugers' vehicle was the only vehicle they had seen on the road all day. Rosanne got out of their vehicle and took photographs of the license plate on their truck parked at the side of the road. While driving by the hunters' location, the Shugers also honked their horns, allowed their dog to bark out of the vehicle's open windows, and talked loudly with one another. Several minutes later, the Shugers did a second drive-by. Myers and Uzelac figured that the drive-bys would continue as long as they remained on the property, so they packed up and left. Dale Jalevocky ("Jalevocky") and James Gaskill ("Gaskill") were also hunting in Beverly Shores that day. They also witnessed the Shugers' drive-bys and complained to local law enforcement of the Shugers' disturbance.

On February 8, 2002, the State charged both Frederick and Rosanne with two counts of hunter harassment. The Shug-

---

1. We admonish Appellants' counsel for failing to comply with Indiana Appellate Rule 50(A)(2) regarding Appendices. This rule states, in part, "[t]he appellant's Appendix shall contain a table of contents and copies of the following documents ... (a) a chronological case summary for the trial court or Administrative Agency." We further draw counsel's attention to Indiana Appellate Rule 46(A)(10), regarding Appellant's brief, which states, "[t]he brief shall include any written opinion, memorandum of decision or findings of fact and conclusions thereon relating to the issues raised on appeal."

ers moved to dismiss the charges on October 31, 2002, arguing that the provision of the Hunter Harassment Act under which they were charged violates the United States and Indiana Constitutions. The trial court denied their motion to dismiss.

The trial court then conducted a jury trial on July 18–20, 2005, and Frederick and Rosanne were found guilty on both counts of violating the Hunter Harassment Act. The trial court sentenced the Shugers on July 25, 2005. The Shugers now appeal. Additional facts will be provided as necessary.

## I. Constitutionality of the Hunter Harassment Act

### A. *First Amendment*

■ The first issue the Shugers raise is whether Indiana's Hunter Harassment Act violates the First Amendment of the U.S. Constitution. Whether a statute is constitutional on its face is a question of law. *State v. Moss–Dwyer*, 686 N.E.2d 109, 110 (Ind.1997) (citation omitted). When the issue presented on appeal is a question of law, we review the matter de novo. *Id.* (citing *Brown v. State*, 653 N.E.2d 77, 81 (Ind.1995)). A statute is presumed constitutional until the party challenging the statute clearly overcomes this presumption by a contrary showing. *Sims v. U.S. Fid. & Guar. Co.*, 782 N.E.2d 345, 349 (Ind.2003) (citing *Boehm v. Town of St. John*, 675 N.E.2d 318, 321 (Ind. 1996)). This court may nullify a statute on constitutional grounds only where such a result is clearly rational and necessary. *Id.* (citing *Bd. of Comm'rs of the County of Howard v. Kokomo City Plan Comm'n*, 263 Ind. 282, 330 N.E.2d 92, 95 (1975)).

The First Amendment, incorporated to the states via the Fourteenth Amendment, protects free speech, providing in pertinent part that "Congress shall make no law ... abridging the freedom of speech." As a threshold matter, we must first determine whether the Hunter Harassment Act encompasses communicative conduct to which we should apply First Amendment scrutiny. The State seems to maintain that this act regulates conduct, and therefore, does not implicate First Amendment concerns. The Hunter Harassment Act provides:

> A person who knowingly or intentionally (1) disturbs a game animal; or (2) engages in an activity or places an object or substance that will tend to disturb or otherwise affect the behavior of a game animal; with intent to prevent or hinder the legal taking commits a Class C misdemeanor.

Ind.Code § 14–22–37–2(b) (1998).

■ The United States Supreme Court "has applied First Amendment scrutiny to a statute regulating conduct which has the incidental effect of burdening the expression of a particular political opinion." *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 702, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986). In fact, "it is now well settled that constitutionally protected forms of communication include parades, dances, artistic expression, picketing, wearing arm bands, burning flags and crosses, commercial advertising, charitable solicitation, rock music, some libelous false statements, and perhaps even sleeping in a public park." J. Stevens, *The Freedom of Speech*, 102 Yale L.J. 1293, 1298 (1993). Given this precedent, we conclude that the Hunter Harassment Act does have an incidental effect of burdening the expression of a particular political opinion, as demonstrated by this case where animal rights activists attempted to express their political opinion by creating noise during a hunt. Consequently, we proceed to apply First Amendment scrutiny.

■ To determine the level of First Amendment scrutiny we should apply, we

must first inquire into whether the Hunter Harassment Act's proscriptions are content based or content neutral. The government's purpose behind enacting the statute is the controlling consideration in determining whether the statute is content neutral. *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). "Government regulation of expressive activity is content neutral so long as it is *'justified* without reference to the content of the regulated speech.'" *Id.* (quoting *Clark v. Cmty. for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984)) (emphasis in original). A law is content neutral if it regulates only the time, place, or manner of speech irrespective of content. *Consol. Edison Co., v. Pub. Serv. Comm'n*, 447 U.S. 530, 536, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980) (citations omitted).

On appeal, the Shugers concede that "Indiana's Hunter Harassment Act has no explicit content-based limitations on its face." Br. of Appellants at 19. However, they contend that this act is analogous to the federal government's attempt to regulate speech through the Flag Protection Act of 1989, which was held unconstitutional in *U.S. v. Eichman*, 496 U.S. 310, 110 S.Ct. 2404, 110 L.Ed.2d 287 (1990). In *Eichman*, the Supreme Court found that even though the Flag Protection Act contained "no explicit content-based limitation on the scope of prohibited conduct, it [was] nevertheless clear that the Government's asserted interest [was] 'related to the suppression of free expression,' and concerned with the content of free expression" as the purpose behind the act was the "perceived need to preserve the flag's status as a symbol of our nation and certain national ideas." *Id.* at 315, 110 S.Ct. 2404 (quoting *Texas v. Johnson*, 491 U.S. 397, 410, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989)).

 "The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Hill v. Colorado*, 530 U.S. 703, 719, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) (quotation omitted). In looking to *Hill* and *Eichman* for guidance, we determine that the Indiana Hunter Harassment Act passes this test for three independent reasons. First, the statute is not a "regulation of speech." Rather, it is a regulation of the place and the manner where some speech may occur. Protestors' speech is merely limited in that it cannot interfere with a lawful hunt on lands designated for bow hunting.

Second, unlike the statute at issue in *Eichman*, the Hunter Harassment Act was not adopted "because of disagreement with the message it conveys." *See Hill*, 530 U.S. at 719, 120 S.Ct. 2480. This conclusion is supported by the State's evidence of the statute's purpose of maintaining safe hunts and helping control the overpopulation of deer. Furthermore, we find that the statute's restrictions apply equally to all individuals or protestors, "regardless of viewpoint, [as] the statutory language makes no reference to the content of the speech." *See id.*

Third, the State's interest in protecting hunters and protestors' safety as well as facilitating the taking of game for ecological reasons are unrelated to the content of the protestors' speech. *See id.* Therefore, we conclude that the case at hand is readily distinguishable from *Eichman*. Whereas the Supreme Court concluded that the purpose behind the Flag Protection Act was specifically related to the suppression of free expression, the purpose behind the Hunter Harassment Act is substantially related to governmental in-

terests unconnected to the expression of a political viewpoint. *See Eichman,* 496 U.S. at 315, 110 S.Ct. 2404.

We further conclude that the act is not necessarily content based merely because its application may tend to infringe more on animal rights activists' speech. The U.S. Supreme Court has previously refused the theory that "a statute restricting speech becomes unconstitutionally content based because of its application to the specific locations where that discourse occurs." *Hill,* 530 U.S. at 724, 120 S.Ct. 2480 (quotation omitted). In *Hill,* the Supreme Court noted that "[a] statute prohibiting solicitation in airports that was motivated by the aggressive approaches of Hare Krishnas does not become content based solely because its application is confined to airports—the specific locations where that discourse occurs." *Id.* (quotation omitted). Likewise, a statute prohibiting sitting at a lunch counter for an hour without ordering any food "would not be 'content based' even if it were enacted by a racist legislature that hated civil rights protestors." *Id.* In line with this precedent, we conclude that the Hunter Harassment Act is content neutral despite its application to the specific location of a hunting area, where animal rights' activists would be more likely to protest.

█ Upon determination that the Hunter Harassment Act is a content neutral regulation of speech, we must next determine whether the act is a valid time, place, and manner regulation that is "narrowly tailored" to serve a significant interest. *See Hill,* 530 U.S. at 725, 120 S.Ct. 2480. The State maintains that its interest at issue in the statute is twofold: to maintain safety during the hunting season and also to facilitate the taking of game because of ecological concerns from exploding animal populations.

The Shugers contend that the State's concern with safety is not a sufficiently significant state interest as "the record . . . is devoid of any evidence of a history of problems between hunters and anti-hunting protestors leading to armed conflicts in the state." Br. of Appellants at 32. However, the United States District Court in Montana faced a similar challenge to a hunter harassment act where a protestor placed himself between a buffalo and a hunter "who was aiming a loaded rifle at the buffalo." *Lilburn v. Racicot,* 855 F.Supp. 327, 328 (D. Montana 1991), aff'd, 967 F.2d 587 (9th Cir.1992). The district court concluded:

> Although the statute may inhibit speech to some limited degree, it also protects hunters and those opposed to hunting from the very kind of harm which may have occurred when the plaintiff stepped in front of the hunter, who was pointing a loaded rifle at the bison. The goal of the statute is clearly reasonable.

*Id.* at 329. "It is a traditional exercise of the States' police powers to protect the health and safety of their citizens," and we conclude that the State clearly had a valid and significant government interest in passing the Hunter Harassment Act to ensure safer hunting activities. *Hill,* 530 U.S. at 715, 120 S.Ct. 2480 (quotation omitted).

Unlike the Shugers, we do not believe it hard to imagine a scenario where protestors' safety would be compromised during a hunt. Indeed, Frederick's unchallenged conviction for intimidation portends as much.

Regarding the State's ecological concerns, the Shugers contend that the State has raised "vague notions of ecological preservation" for the first time on appeal. Reply Br. of Appellants at 7. We note that the transcript of the jury trial is replete with references to the overpopulation of

deer and meetings conducted to determine how best to cull the population. *See* tr. pp. 58, 120–21, 122, 187, 207, 423, 424. Pursuant to the meetings conducted by the Indiana Dunes Deer Study Committee, it was determined that sterilization or contraceptives would not work on the free ranging deer. *Id.* at 121. Rather, the committee's report "stated that lethal removal via either controlled hunts, open hunting or sharp shooters [are] basically the only viable controlled methods to reduce [the] deer population." *Id.* Given these ecological concerns, "[h]unting is a legitimate activity which the state may protect in any reasonable and constitutionally permissible manner." *Lilburn,* 855 F.Supp. at 329. Therefore, we conclude that the Hunter Harassment Act serves significant and legitimate state interests.

Upon determining that the statute is grounded on significant state interests, we must next analyze whether the statute is narrowly tailored to serve these interests. In analyzing whether a statute is narrowly tailored, the Supreme Court has emphasized, "when a content-neutral regulation does not entirely foreclose any means of communication, it may satisfy the tailoring requirement even though it is not the least restrictive or least intrusive means of serving the statutory goal." *Hill,* 530 U.S. at 726, 120 S.Ct. 2480.

Contending that the statute is not sufficiently narrowly tailored, the Shugers substantially rely on *Dorman v. Satti,* 862 F.2d 432, 437 (1988), where the Second Circuit declared a hunter harassment statute unconstitutional because it interfered with free speech. We must initially note a significant difference between the statute at issue in *Dorman* and Indiana's Hunter Harassment Act, however. The Connecticut statute at issue in *Dorman* prohibited persons from interfering with another person who was taking or *preparing to take*

wildlife. The court found such language too broad because the clause "preparing to take" could be construed to encompass buying supplies long before the actual hunt takes place, consulting a road map, making plans during a workplace coffee break, or even getting a good night's sleep before embarking on a hunting trip. *Id.* Given this broad scope, the court determined that the statute was not properly tailored to survive constitutional scrutiny. *Id.*

Indiana's Hunter Harassment Act, by contrast, is narrowly tailored to prevent speech only in hunting areas that is intended to disturb game and impede the lawful taking of such game. Although this statute may not be the least restrictive means for the State to pursue its purported interests, the statute does leave open numerous possibilities for protest, including attending town hall meetings and protesting in other locations besides hunting grounds while a lawful hunt is underway. The Shugers, in fact, took advantage of these other venues to express their anti-hunting viewpoints. Because other means of communication have not been foreclosed by the content-neutral Hunter Harassment Act, we conclude that the statute is sufficiently tailored to meet the State's safety and ecological concerns.

**B. *Overbreadth***

 The Shugers next assert that the Indiana Hunter Harassment Act is constitutionally void for being overly broad. The Shugers' primary contention is that the statute encompasses a broad range of activities, such as honking one's horn, allowing one's dog to bark, and loudly talking. The First Amendment overbreadth doctrine allows an individual to attack the constitutionality of a statute that applies to protected speech, even if the conduct by the challenging party is clearly unprotected. *New York v. Ferber,* 458 U.S. 747,

769, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982) (citations omitted). However, because of the relative ease of imagining a situation in which the application of a statute would infringe on constitutional rights, the overbreadth in a First Amendment challenge must be "substantial." *Id.* at 769–70, 102 S.Ct. 3348 (citing *Broadrick v. Oklahoma,* 413 U.S. 601, 613, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)). The Supreme Court has held that "particularly where *conduct* and not merely speech is involved . . . the overbreadth of a statute must not only be real, but substantial as well." *Hill,* 530 U.S. at 732, 120 S.Ct. 2480 (emphasis added) (internal quotations omitted).

■ Here, the Hunter Harassment Act's primary intention is to regulate the conduct of interfering with the lawful taking of game. The Hunter Harassment Act "simply does not 'ban' any messages, and likewise it does not 'ban' any signs, literature, or oral statements." *Id.* The statute merely regulates the time, place, and manner in which communications may occur. *Id.* The Shugers have not persuaded us that the impact of the statute on the conduct of other speakers will differ from its impact on their own conduct at issue in this case. *See id.* Like the Shugers' own activities, the conduct of other protesters who come near hunting grounds and conduct themselves in a manner to scare game animals away from hunters, is encompassed within the statute's "legitimate sweep." *See id.* Therefore, because this statute is merely a restriction on the manner and place in which an activist can conduct his or her protest, we conclude that the Hunter Harassment Act is not substantially overbroad.

### C. *Vagueness*

The Shugers next contend that the Hunter Harassment Act is unconstitutionally vague. In particular, they maintain that the statute does not sufficiently define the conduct it prohibits. In addressing a constitutional vagueness challenge our supreme court stated:

A statute will not be found unconstitutionally vague if individuals of ordinary intelligence would comprehend it to adequately inform them of the conduct to be proscribed. The statute need only inform the individual of the generally proscribed conduct, a statute need not list with itemized exactitude each item of conduct prohibited.

*State v. Downey,* 476 N.E.2d 121, 122 (Ind. 1985) (citations omitted).

■ Any purported vagueness in the Hunter Harassment Act is ameliorated by the statute's scienter requirement. *See Hill,* 530 U.S. at 732, 120 S.Ct. 2480. The statute only applies to conduct committed with the *intent* to prevent or hinder the legal taking of a game animal. Ind.Code § 14–22–37–2(b). In *Hill,* the Supreme Court concluded that a statute prohibiting "knowingly" approaching within eight feet of another, without that person's consent, for the purpose of engaging in oral protest, education, or counseling, was easily understandable to a person of ordinary intelligence because of the scienter requirement. *Id.* The Court concluded that given this knowledge requirement, "[t]he likelihood that anyone would not understand [the] common words [of the statute] seems quite remote." *Id.*

■ Like the petitioners in *Hill,* the Shugers proffer many theories as to what the statute covers, including placing a fence around one's yard, walking in the woods, playing loud music, and even wearing aftershave or perfume outdoors. Br. of Appellants at 16. In *Hill* the Supreme Court stated that "while there is little doubt that imagination can conjure up hypothetical cases in which the meaning of

[the statute's] terms will be in nice question, because we are condemned to the use of words we can never expect mathematical certainty from our language." *Id.* at 733, 120 S.Ct. 2480 (quotations omitted). We likewise conclude that despite the hypotheticals the Shugers pose to us in their brief, it is clear what activities the Hunter Harassment Statute as a whole prohibits. "More importantly, speculation about possible vagueness in hypothetical situations not before [the court] will not support a facial attack on a statute when it is surely valid in the vast majority of its intended applications." *Id.* (quotation omitted).

## II. Sufficiency of the Evidence

 Lastly, the Shugers contend there was insufficient evidence presented at trial to support their convictions. In reviewing a sufficiency of the evidence claim, we neither reweigh the evidence nor assess the credibility of the witnesses. *Love v. State,* 761 N.E.2d 806, 810 (Ind. 2002). We must respect the jury's exclusive province to weigh conflicting evidence. *McHenry v. State,* 820 N.E.2d 124, 126 (Ind.2005) (quotation omitted). On review, we look to the evidence most favorable to the verdict and reasonable inferences drawn therefrom. *Id.* We will affirm the conviction if there is probative evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *Id.* (quotation omitted).

 The Shugers specifically contend that the State presented insufficient evidence to prove that they actually *intended* to prevent or hinder the legal taking of a game animal. Rosanne, in partic-

ular, argues that there was not sufficient evidence of her intent to support her conviction. It is well established that "[t]he element of intent may be proven by circumstantial evidence alone, and it is well-established that knowledge and intent may be inferred from the facts and circumstances of each case. The State is not required to prove intent by direct and positive evidence." *Lykins v. State,* 726 N.E.2d 1265, 1270–71 (Ind.Ct.App.2000) (citation omitted).[2] "It is common in the law to examine the content of a communication to determine the speaker's purpose." *Hill,* 530 U.S. at 721, 120 S.Ct. 2480.

 At trial, the State presented evidence that both Fredrick and Rosanne actively voiced their objections to bow-hunting at several public meetings. Tr. pp. 361–62, 389–94, 423–25. Furthermore, Ryan Koepke ("Koepke"), an employee of the Indiana Dunes National Lakeshore, testified that on November 18, 2001, the Shugers came into the Visitors' Center and confronted him about hunting deer in the Beverly Shores area. *Id.* at 218–21. Koepke testified that they were both very agitated, and that Frederick leaned on the counter and pointed at him several times. *Id.* at 221. Regarding their conversation, Koepke testified that Frederick said:

> [I]t should not be wrong for him to drive around Beverly Shores and honk his horn trying to scare the deer. He said that it should not be wrong for him to drive around Beverly Shores having his dog sticking his head out the window and barking trying to scare deer. At one point he did say it should not be wrong for me to scare the deer.

---

2. In regards to the Shugers' argument that presenting evidence of their statements to prove intent implicates their First Amendment rights, we note that the Supreme Court has stated, "We have never held, or suggested, that it is improper to look at the content of an oral or written statement in order to determine whether a rule of law applies to a course of conduct." *Hill,* 530 U.S. at 721, 120 S.Ct. 2480.

*Id.* at 222. Rosanne was with Frederick when he confronted Koepke.

In light of this testimony, we conclude that the State presented overwhelming circumstantial evidence at trial from which a reasonable jury could have concluded that both Frederick and Rosanne had the intent to scare deer away on November 7th. Therefore, we find no error.

■ The Shugers next assert that the State presented insufficient evidence to sustain their second count of violating the Hunter Harassment Act as the charging information listed Dale Jalevocky ("Jalevocky") as a witness, but Jalevocky never testified at trial. At the time of the alleged conduct on November 7, Jalevocky was hunting with James Gaskill ("Gaskill"), who did testify at trial as to the allegations in the State's information.

■ In fact, the two men not only observed the incident, but also made a video recording of it. Gaskill testified, "While sitting in the blind, I heard a vehicle traveling down the roadway. At which time, I heard a dog starting to bark. I felt it was kind of excessive so I asked Dale to turn on the camera to capture what we were hearing." Tr. p. 323. The two filmed the vehicle as it traveled west on Charing Road, and they also observed Rosanne get out of their vehicle and circle around a parked vehicle belonging to another hunter. *Id.* at 324–25. Not only did Gaskill testify as to this incident, but the jury also

viewed the videotape that Gaskill and Jalevocky made of the occurrence. *Id.* at 329.

Clearly, Gaskill's testimony in conjunction with a videotape of the incident was sufficient evidence to sustain this second count for Hunter Harassment. We further conclude that because the Shugers failed to challenge the sufficiency of the information through a motion to dismiss prior to their arraignment, they have waived that issue on appeal. *See Townsend v. State,* 632 N.E.2d 727, 730 (Ind. 1994); *Buzzard v. State,* 712 N.E.2d 547, 551 (Ind.Ct.App.1999), *trans. denied.*[3]

### Conclusion

We conclude that Indiana's Hunter Harassment Act is constitutional and that there was sufficient evidence presented at trial to support the Shugers' convictions for violating the Act.

Affirmed.

SHARPNACK, J., concurs.

KIRSCH, C.J., dissents with separate opinion.

KIRSCH, Chief Judge, dissenting.

I respectfully dissent.

While I agree with my colleagues that Frederick and Rosanne Shuger had the requisite intent to prevent or hinder the legal taking of deer, I find no evidence in the record that either they or their dog disturbed or tended to disturb or otherwise affect the behavior of any deer.

---

**3.** Although on appeal the Shugers do not contend that they were prejudiced by the State's failure to list Gaskill as a witness in the charging information, we note that our supreme court has held that the State's failure to list potential witnesses on a charging information does not prejudice a defendant who was well aware of that person's identity and status as a potential State's witness. *Johnson v. State,* 446 N.E.2d 1307, 1309 (Ind.1983) (citation omitted). On April 29, 2005, the

State filed a witness and exhibit list with the court, which included James Gaskill as a potential witness and also lists "Video footage by Dale Jalovecky and Jim Gaskill, previously made available to defense counsel" as an exhibit. Appellants' App. pp. 96–97. Therefore, we conclude that the Shugers were well aware of the evidence that would be presented against them regarding this second count and were not prejudiced.

There is no evidence that any particular deer left the area or took any other action in response to their actions. In the absence of such evidence, I believe the State failed to make its case. Accordingly, I would reverse the convictions.

Because I would reverse on evidentiary grounds, I do not reach the Shugers' constitutional arguments.